474 S.E.2d 518

**Beverly S. Jackson MUSCATELL, Petitioner Below, Appellee,**

v.

**Jane L. CLINE, Commissioner, Respondent Below, Appellant.**

No. 22945.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 17, 1996.

Decided June 14, 1996.

---

Jerald E. Jones, West & Jones, Clarksburg, for Appellee.

Paul E. Jordan, Senior Assistant Attorney General, Charleston, for Appellant.

ALBRIGHT, Justice.

Appellant, Jane L. Cline, Commissioner of the West Virginia Division of Motor Vehicles (Commissioner), appeals a final order of the Circuit Court of Harrison County, West Virginia, reversing an order of the Commissioner which had revoked the operator's license of Beverly S. Jackson Muscatell, appellee, for a period of six months for driving under the influence of alcohol. For the reasons we articulate, we reverse the judgment of the Circuit Court of Harrison County and remand with directions.

On August 12, 1993, between 5:30 and 6:00 p.m., Senior Trooper G.L. Brown of the West Virginia State Police was on road patrol in Bridgeport, West Virginia, near the intersection of I–79 and U.S. Route 50. He received a radio call from the State Police Communication Office in Shinnston, West Virginia, requesting him to be on the lookout for a

small, light blue vehicle traveling toward Clarksburg from the Grafton area. Trooper Brown was informed that the driver of the vehicle, named Beverly S. Jackson Muscatell, might have been involved in a hit and run accident, might be under the influence of alcohol, and might be proceeding toward Clarksburg from Grafton. At the time of the radio call, Trooper Brown did not know the source of the information conveyed to him and considered it anonymous. The trooper later learned that the information came from Trooper Paul Ferguson[1], who was investigating a reported hit-and-run accident in the Grafton area of West Virginia that appears actually to have been a family argument which did not involve any hit-and-run incident.

Shortly after 6:00 p.m., Trooper Brown was traveling east on U.S. Route 50, near the I–79 interchange, when he observed a woman driving west on U.S. Route 50 in a light blue Dodge Omni or Plymouth Horizon, coming from the direction of Grafton and headed toward Clarksburg. The trooper turned around and followed the blue car west on U.S. Route 50. The car turned off U.S. Route 50 onto what is called Bridgeport Hill or old Route 50, going toward Clarksburg. The trooper testified on direct examination that the vehicle straddled or went across the center line one time before coming back to the driving lane. On cross-examination the trooper acknowledged that he earlier had asserted that he observed no improper driving by appellee at the time of the stop. During oral argument before this Court, it also became unclear as to whether the appellee crossed the centerline or simply moved from one westbound lane to another and back again. The trooper further testified that after observing the "straddle" of the centerline, he pulled the vehicle over and asked the subject if her name was Beverly. She answered in the affirmative, and the trooper looked at her operator's license. Trooper Brown advised Ms. Muscatell of the reason for the stop by advising her that a complaint had been made against the type of vehicle she was driving that was coming from

Grafton. No damage to the vehicle was observed.

While questioning Ms. Muscatell and obtaining her license, Trooper Brown detected the strong odor of alcohol "from the vehicle and from her person as she was speaking to me briefly there about the incident ...", presumably the events at Grafton involving an argument there. He questioned Ms. Muscatell as to whether she had been drinking, and she admitted to drinking alcoholic beverages. The trooper testified that Ms. Muscatell was visibly upset, apparently over a family dispute which had taken place before she left Grafton. The trooper asked Ms. Muscatell to get out of her vehicle so he could give her some field sobriety tests. He noticed her eyes were red and bloodshot and she had been crying.

Trooper Brown testified that he administered a preliminary breath test with the Alco Sensor III device. The trooper testified that he had been trained on the device and that the device was "approved by my department to use for the purpose of determining a preliminary analysis of how much somebody's had to drink for probable cause to arrest them or not just on, on the one test." The result of the preliminary test indicated Ms. Muscatell's blood alcohol concentration was .210 by weight.

The trooper further testified that he then administered a series of field sobriety tests. Trooper Brown proceeded to administer the walk-and-turn test. He administered the horizontal gaze nystagmus test (HGN), for which he testified he was trained, and recited the indications that appellee did not achieve an acceptable grade on it. Finally, the trooper testified, he administered the one-leg-stand test and described her reactions in his testimony. During the walk-and-turn test, Ms. Muscatell stopped walking to steady herself, lost her balance while walking, and did not turn and pivot correctly. During the HGN test, Ms. Muscatell's eyes could not smoothly follow a stimulus at less than a 45 degree angle from forward gaze. She exhib-

---

1. Paul Ferguson, a State Police officer in Grafton, West Virginia, contacted the communication office in Shinnston, West Virginia, and provided the information that was transmitted to Trooper Brown.

ited the presence of distinct nystagmus at maximum deviation from forward gaze. During the one-leg-stand test, Ms. Muscatell used her arms for balance and lowered her foot to the ground. She became frustrated and told the trooper she could not do the test.

"That would have been all the field sobriety tests I would have give her to give me probable cause to make my decision of whether to arrest her or not," the trooper testified. He placed her under arrest for driving under the influence of alcohol at 6:20 p.m. and transported her to the Harrison County Sheriff's Department, where he administered a secondary breathalyzer chemical test. These results were not entered into evidence at the administrative hearing because Trooper Brown did not testify he observed Ms. Muscatell for twenty minutes to ensure she had not ingested food, drink, or other materials by mouth.

Ms. Muscatell was read her rights in preparation for an interview. She signed the form and indicated she did not want counsel, and she would not answer the standardized questions on the form. The interview ended, and Ms. Muscatell was transported to the Harrison County Correctional Center.

Trooper Brown timely filed the "statement of arresting officer" required by law in DUI cases to be submitted to the Division of Motor Vehicles.[2] That statement included the results of the secondary test which were not admitted into evidence in the administrative hearing. Thereupon, the Commissioner issued a notice of revocation of appellee's driver's license which began the proceeding now before us. That notice specified that the

revocation was for the offense of driving a motor vehicle in this State under the influence of alcohol. It was sent to Ms. Muscatell on August 20, 1993, and further advised her that, in accordance with W.Va.Code § 17C–5A–1(c) (1994),[3] her privilege to operate a motor vehicle in this State was revoked.[4]

Ms. Muscatell timely requested an administrative hearing. On March 28, 1994, the hearing was held before a hearing examiner of the Division of Motor Vehicles. Trooper Brown testified at the hearing, and Ms. Muscatell was represented by counsel. It appears from the transcript of the administrative hearing that in the parallel criminal proceeding against appellee, Trooper Brown had asserted that at the time he stopped appellee in August, 1993, she was not doing any improper driving and that he had no reason to stop appellee other than the anonymous message radioed from the Shinnston State Police headquarters. As noted above, Trooper Brown stated otherwise in the administrative hearing, claiming that appellee had moved across the centerline of the highway immediately before being stopped by the trooper.

At the administrative hearing, Ms. Muscatell moved to exclude the results of the HGN test, stating that Trooper Brown did not establish his qualifications to give the test and arrive at a conclusion as a result of his use of the test. Ms. Muscatell argued that the test is not scientifically accepted under West Virginia law. Ms. Muscatell also moved to dismiss the revocation proceedings on the grounds that Trooper Brown did not have probable cause to stop her vehicle. She argued that the trooper did not have a de-

---

**2.** *See* W.Va.Code § 17C–5A–1(b) (1994).

**3.** West Virginia Code § 17C–5A–1(c) (1994) states, in relevant part:

(c) If, upon examination of the written statement of the officer and the tests results described in subsection (b) of this section, the commissioner shall determine that a person was arrested for an offense described in section two, article five of this chapter or for an offense described in a municipal ordinance which has the same elements as an offense described in said section two of article five, and that the results of any secondary test or tests indicate that at the time the test or tests

were administered the person had, in his or her blood, an alcohol concentration of ten hundredths of one percent or more, by weight, or at the time the person was arrested he or she was under the influence of alcohol, controlled substances or drugs, the commissioner shall make and enter an order revoking the person's license to operate a motor vehicle in this state.

**4.** The revocation notice provided:

Revocation period: 6 months, eligible in 90 days, and thereafter until you complete the safety and treatment program and thereafter according to any previous order issued by this division.

scription of the make or model of automobile she was driving but knew only that he was on the lookout for a light blue automobile with a female driver. Ms. Muscatell argued also that the trooper had been told the vehicle was involved in a hit-and-run accident, and there was no evidence of damage on her automobile. She complained that all of the information was provided by an anonymous source.

As noted above, the hearing examiner employed by the Division of Motor Vehicles heard the case. The record does not contain a separate order from the hearing examiner, ruling on the issues in the case or discussing the evidence and related conclusions of law. Rather, the record contains an order, signed by the Commissioner, which makes findings of fact and conclusions of law and addresses the various motions made by appellee at the hearing. With respect to the admissibility of Trooper Brown's testimony relating to the HGN test, the Commissioner denied this motion of appellee objecting to the consideration of such evidence. The Commissioner relied on *State v. Barker*, 179 W.Va. 194, 366 S.E.2d 642 (1988), and stated that Trooper Brown had been trained at the West Virginia State Police Academy to administer the HGN test. The Commissioner further stated the results of the test were not given undue significance and were given no more evidentiary value than the results of the other field sobriety tests. The Commissioner reasoned that, pursuant to *Barker*, "[t]he results of field sobriety tests are competent evidence on the question of whether a driver is under the influence of alcohol."

The order of the Commissioner also denied appellee's motion with regard to legality of Trooper Brown having stopped appellee based on limited information and an anonymous tip. The order states:

An investigative stop cannot be deemed unreasonable solely because the information upon which it is based came from an anonymous source. Rather, an investigative stop is permissible and justified whenever the information, as corroborated by independent police work, exhibits sufficient indicia of reliability to provide a reasonable suspicion for the stop, even where the informant remains anonymous.

The Commissioner's order states that the trooper observed Ms. Muscatell's vehicle cross over the centerline of the roadway, in violation of W.Va.Code § 17C-7-1(a) (1951); [5] this, the Commissioner said, justifies an officer stopping a vehicle under the Fourth Amendment. The Commissioner said that this Court has held "that an automobile may be stopped for some legitimate state interest." [6] The Commissioner concluded that Trooper Brown had probable cause to stop Ms. Muscatell. The Commissioner's order did not discuss the difference between the testimony of the trooper on direct and cross-examination with regard to whether or not he had observed any improper driving by the appellee prior to stopping her vehicle.

At the administrative hearing, Ms. Muscatell also moved to exclude the results of the secondary chemical test forwarded to the Division of Motor Vehicles with the arresting officer report because a foundation was not properly established, in that the trooper did not testify as to his credentials and his competency to conduct the test. Rather, the hearing examiner took judicial notice of that fact. The Commissioner granted the motion to exclude the results of the secondary chemical test because "no evidence was presented to demonstrate that [Ms. Muscatell] was observed for a period of twenty minutes prior to the administration of the test, during which time she had no oral intake." The motion to exclude the results on the other grounds was denied.

Ms. Muscatell also moved to dismiss the revocation proceedings on the grounds there was no probable cause to arrest her for driving under the influence of alcohol. The

---

**5.** West Virginia Code § 17C-7-1 (1951) states: "(a) Upon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway...."

**6.** The Commissioner refers to syllabus point 2, *State v. Flint,* 171 W.Va. 676, 301 S.E.2d 765

(1983); syllabus, *State v. Shingleton,* 171 W.Va. 668, 301 S.E.2d 625 (1983); syllabus point 1, *State v. Totten,* 169 W.Va. 729, 289 S.E.2d 491 (1982); and syllabus point 4, *State v. Moore,* 165 W.Va. 837, 272 S.E.2d 804 (1980).

Commissioner's order denied that motion, stating "the evidence establishe[d] probable cause the [sic] the arrest." The Commissioner reviewed this evidence. Again, the Commissioner relies on the evidence that Ms. Muscatell crossed the centerline and drove astride it for some time before returning to the proper traffic lane. After she was stopped, the trooper smelled the odor of alcoholic beverages about her person, she admitted to consuming alcoholic beverages, and she exhibited red, bloodshot eyes. The results of the preliminary breath test indicated a blood alcohol concentration level of two hundred ten thousandths of one percent (.210) by weight, and Ms. Muscatell could not successfully complete any of the field sobriety tests. The Commissioner's order concluded that the trooper had probable cause to arrest Ms. Muscatell for driving under the influence of alcohol. Finally, the Commissioner concluded that Ms. Muscatell had operated a motor vehicle under the influence of alcohol, and she was ordered to immediately surrender her driver's license to the West Virginia Division of Motor Vehicles.

Ms. Muscatell appealed the Commissioner's order to the Circuit Court of Harrison County. The circuit court concluded that the results of the HGN test should not have been admitted as evidence, holding that reliability was not established pursuant to *State v. Barker*, 179 W.Va. 194, 366 S.E.2d 642 (1988), and further held that Trooper Brown did not have probable cause to stop Ms. Muscatell's vehicle and, therefore, the arrest was unlawful; that after exclusion of the secondary chemical test, insufficient evidence existed to establish by a preponderance of the evidence that Ms. Muscatell was driving under the influence of alcohol and that, based on the facts and applicable law, the Commissioner was plainly wrong. In reaching its conclusion, the Court below found that Trooper Brown had stopped appellee on the basis of information for which he had no knowledge as to the source or reliability, that the Trooper had admitted stopping appellee on the basis of the anonymous information and not because appellee was doing any improper driving, that no damage to appellee's car was observed at the time of the stop, that the upset and crying condition of the appellee at the time could have affected her ability to perform the preliminary sobriety tests, and that although the Commissioner asserted she had not relied on the secondary intoxilyzer test in reaching her conclusions, she had discussed the same in her opinion to such an extent that her decision was likely affected by those results in any event. It is from this decision the Commissioner appeals.

The Commissioner argues that the trial court erred by excluding the results of the HGN test from consideration at the administrative hearing, by holding that Trooper Brown did not have probable cause to stop appellee's vehicle, and by finding that the lower court erred in determining there was not sufficient other evidence after exclusion of the secondary intoxilyzer test to establish appellee was driving a vehicle while under the influence of alcohol.

## THE STANDARD FOR REVIEW

The case before us is an appeal of an administrative order. Before the Circuit Court of Harrison County, that review is controlled by the provisions of W.Va.Code, § 29A–5–4(g) (1964), as follows:

The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision or order are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedures; or

(4) Affected by other error of law; or

(5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

■ On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W.Va.

Code § 29A–5–4(a) (1964) and reviews questions of law presented *de novo;* findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong. *Philyaw v. Gatson,* 195 W.Va. 474, 466 S.E.2d 133 (1995), and W.Va.Code § 29A–5–4(g) (1964).

■ In cases where the circuit court has amended the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo. Burnside v. Burnside,* 194 W.Va. 263, 460 S.E.2d 264 (1995).

### HGN TEST

We begin with the contention of the Commissioner that the trial court erred in ruling the horizontal gaze nystagmus test (HGN) should have been excluded as evidence in the administrative hearing. With respect to the HGN test, the court below concluded:

The results of the Horizontal Gaze Nystagmus test should not have been admitted as evidence by the Respondent because there was no evidence adduced to establish its scientific reliability as required by *State v. Barker* [179 W.Va. 194], 366 S.E.2d 642 (W.Va.1988).

In *Barker,* the driver of an automobile was convicted of third offense of driving under the influence of alcohol. At trial, the officer testified that "based on the results of the HGN test he estimated Barker's blood alcohol level at .20%." 179 W.Va. at 196, 366 S.E.2d at 644. The officer offered no evidence to demonstrate the scientific reliability of the HGN test or the scientific principle upon which the test is based. This Court concluded "that even if the reliability of the HGN test is demonstrated, an expert's testimony as to a driver's performance on the test is admissible only as evidence that the driver was under the influence. Estimates of blood alcohol content based on the HGN test are inadmissible." 179 W.Va. at 198, 366 S.E.2d at 646.

■ In the case at bar, the trial court misconstrued the holding of *Barker. Barker*

allows the admission of the results of the HGN test as evidence the driver was under the influence of alcohol. We find nothing in the record that indicates Trooper Brown attempted to estimate appellee's blood alcohol content with the HGN test. There is no indication the officer gave the HGN test any greater value than any of the other field sobriety tests he administered.

In *Boley v. Cline,* 193 W.Va. 311, 456 S.E.2d 38 (1995), HGN test results were admitted to indicate the appellant was under the influence of alcohol. Even though much of the evidence damaging to the appellant there was excluded at the administrative level, we affirmed the license revocation based on the trooper's detection of the smell of alcohol, observation of the vehicle weaving upon the highway, and the HGN test which indicated appellant was under the influence of alcohol.

In this case, we conclude that Trooper Brown was properly allowed to testify regarding the results of the HGN test as a field sobriety test. We have allowed the results to be used for this purpose in the past; therefore, the lower court's rationale for exclusion is in error. Trooper Brown's testimony regarding his administration of the HGN test and his conclusions from it may be properly considered by the trier of fact subject to the limitations imposed by *Barker* and *Boley.*

### THE STOPPING OF THE VEHICLE

Next we review the circuit court's ruling finding that Trooper Brown did not have probable cause to stop the appellee and the Commissioner's conclusion to the contrary. We conclude that both the Commissioner and the circuit court applied the wrong legal standard in their consideration of the stopping of the vehicle. We conclude further that the Commissioner failed to make an adequate analysis of the facts from which this Court or the circuit court could determine whether the stopping of appellee's vehicle was lawful under the proper standard.

■ The proper standard for determining the propriety of Trooper Brown's stop of the appellee is the reasonable suspicion stan-

dard [7] adopted in *State v. Stuart,* 192 W.Va. 428, 452 S.E.2d 886 (1994), and *Hill v. Cline,* 193 W.Va. 436, 457 S.E.2d 113 (1995). In *Stuart,* we said:

> Police officers may stop a vehicle to investigate if they have an articulable *reasonable suspicion* that the vehicle is subject to seizure or a person in the vehicle has committed, is committing, or is about to commit a crime. . . .

Syl. pt. 1, in part, *State v. Stuart, supra* (emphasis added). This holding overruled *State v. Meadows,* 170 W.Va. 191, 292 S.E.2d 50 (1982), which required probable cause to stop a car. The reasonable suspicion standard was defined as being:

> "[A] less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." 496 U.S. at 330, 110 S.Ct. at 2416, 110 L.Ed.2d at 309.

192 W.Va. at 432, 452 S.E.2d at 890.

■ In reaching its conclusion, the *Stuart* Court also defined the test for evaluating the facts in the application of the "reasonable suspicion" standard:

> When evaluating whether or not particular facts establish reasonable suspicion, one must examine the totality of the circumstances, which includes both the quantity and quality of the information known by the police.

Syl. pt. 2, *State v. Stuart, supra.*

In *Stuart,* this Court offered further guidance on the constitutional parameters of a "reasonable suspicion" stop, as follows:

> Although "[reasonable] suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence," *see United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989), the Fourth Amendment to the

United States Constitution and Section 6 of Article III of the West Virginia Constitution nevertheless require that the police articulate facts which provide some minimal, objective justification for the stop. Specifically, in *Sokolow,* the Court stated: "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch"'. . . . The Fourth Amendment requires 'some minimal level of objective justification' for making the stop." 490 U.S. at 7, 109 S.Ct. at 1585, 104 L.Ed.2d at 10. (Citations omitted). The criteria for reasonable suspicion to stop a vehicle are very similar to a street stop under *Terry.* Factors such as erratic or evasive driving, the appearance of the vehicle or its occupants, the area where the erratic or evasive driving takes place, and the experience of the police officers are significant in determining reasonable suspicion.

*State v. Stuart,* 192 W.Va. at 433 n. 10, 452 S.E.2d at 891 n. 10.

■ We have examined the record and contentions of the parties in the case *sub judice* in an effort to apply these principles to the instant case. Appellee contends that Trooper Brown testified that he did not know the source of the information and observed no damage to appellee's vehicle which would support the anonymous hit-and-run allegation. (The hit-and-run allegation later turned out to be wrong.) Therefore, appellee argues the quantity of the information was inadequate to stop her vehicle and the ruling of the circuit court should be affirmed. The Commissioner, on the other hand, argues that the trooper made the arrest not only because he received a "be on the lookout" alert, but also because appellee was observed by him to have violated W.Va.Code § 17C–7–1, by straddling or crossing the centerline.

*Stuart* speaks directly to the issue of an anonymous tip. In *Stuart,* the Monongalia Emergency Centralized Communications Agency received an anonymous call stating that a drunk driver had pulled into the Sab-

---

7. In her discussion regarding the stop of appellee, the Commissioner discussed the reasonable suspicion standard. However, she proceeded to evaluate the evidence under a probable cause standard.

ration McDonald's. The caller stated the driver had been driving erratically in the wrong direction and supplied police with the type of car and license number. The call was transferred to the Morgantown Police Department, and two police officers were sent to the area. The officers spotted the vehicle and noted the car was traveling at 25 miles per hour on a straight road in a 35–mile–per-hour zone at 1:01 a.m. on a Sunday morning. Upon stopping and approaching the vehicle, the officers detected "a strong smell of alcohol." The subject was asked to perform and failed a field sobriety test, after which he was placed under arrest. The stop and arrest were challenged because the defendant testified he did not stop at McDonald's but rather he had stopped at Subway to get a sandwich. When the police inventoried his vehicle, the Subway sandwich was found. Also, the events of the stop were videotaped by a camera in one of the officers' vehicles. However, prior to the proceedings in trial court, the videotape was erased.[8] The trial court determined the officers had reasonable suspicion to make the stop but indicated the court would only "consider the anonymous call as having 'the effect of putting the officers on the scene.'" 192 W.Va. at 431, 452 S.E.2d at 889. This Court concluded that the officers had reasonable suspicion to make the investigatory stop and stated, in the words cited by the Commissioner in her administrative order in *Stuart:*

> [W]e conclude that for a police officer to make an investigatory stop of a vehicle the officer must have an articulable reasonable suspicion that a crime has been committed, is being committed, or is about to be committed. In making such an evaluation, a police officer may rely upon an anonymous call if subsequent police work or other facts support its reliability, and, thereby, it is sufficiently corroborated to justify the investigatory stop under the reasonable-suspicion standard.

192 W.Va. at 435, 452 S.E.2d at 893.

Accordingly, the mere fact that Trooper Brown acted on the basis of an anonymous tip is not dispositive of the issue presented. The question presented is whether subse-

quent police work or other facts supported its reliability, and thereby, the anonymous tip was sufficiently corroborated to justify the investigatory stop. We note first that the trooper knew at least that the automobile to be watched for was light blue in color, as was appellee's. Second, appellee's automobile was indeed observed by the trooper to be travelling toward Clarksburg, from the general direction of Grafton, as reported in the anonymous call. Third, we note that there is substantial confusion in the record as to whether the make or model of the automobile to be watched for under the "lookout" call was (1) communicated to the trooper through the anonymous call and (2) was verified by the trooper, by independent police work, to be the same make or model as that driven by appellee. Fourth, it is clear that appellee's vehicle had not been involved in a "hit-and-run" accident, as advised by the anonymous call, and, in any event, that the trooper did not verify any damage to appellee's automobile before effecting the investigatory stop. It would appear that, solely on the basis of these four factors, an investigatory stop of appellee could not be justified. If just these factors were held to be sufficient to make an investigatory stop, one could conclude that the protections afforded by the Fourth Amendment to the United States Constitution and Section 6 of the West Virginia Constitution are more illusory than real. With respect to these factors, there clearly is almost no subsequent police work or other facts which support the reliability of the anonymous tip and thereby sufficiently corroborate it. To hold otherwise would justify the stopping of any light blue car headed east and driven by a female.

However, the Commissioner relies not only on the "be on the lookout" alert, but also on the observation by the trooper of a probable violation by appellee of W.Va.Code § 17C–7–1, by straddling or crossing the centerline of the highway "for some distance before returning to the proper traffic lane". (Record, p. 13.) It appears that if the trooper did indeed observe such a misdemeanor violation of the "rules of the road", his stop would clearly be justified in any event. When we

---

**8.** The videotape had previously been viewed at a     hearing in magistrate court.

examine the record to find substantial evidence in support of the trooper's observation of such a violation, we find a conflict. As noted, under direct examination the trooper testified that he did observe appellee's vehicle briefly straddling or crossing the centerline. Upon cross examination, however, the trooper appears to have testified that the information upon which he relied at the time of the stop was limited to the information contained in the anonymous phone call.

Here, observations of the trooper immediately before making the stop are critical to the legality of the stop. It must be determined that the stop is not justified by mere pretext that would mock the constitutional protections to which all citizens are entitled.

Nothing in the findings of fact of the Commissioner advises this Court why the Commissioner resolved this conflict in the testimony of the trooper in favor of the direct testimony and disregarded the cross-examination. We have no separate evaluation of the evidence by the hearing examiner who observed the demeanor of the witness on this critical issue before us. We have said, with respect to decisions of administrative agencies following from findings of fact and conclusions of law proposed by opposing parties, that the agency must rule on the issues raised by the opposing parties with sufficient clarity to assure a reviewing court that all those findings have been considered and dealt with, not overlooked or concealed. *See, St. Mary's Hospital v. State Health Planning and Development Agency,* 178 W.Va. 792, 364 S.E.2d 805 (1987). We have also said that in requiring an order by an agency in a contested case to be accompanied by findings of fact and conclusions of law, "the law contemplates a reasoned, articulate decision which sets forth the underlying evidentiary facts which lead the agency to its conclusion...." Syl. pt. 2, in part, *Citizens Bank v. W. Va. Board of Banking and Financial Institutions,* 160 W.Va. 220, 233 S.E.2d 719 (1977). The purpose of these rules is not to burden an administrative agency with proving or recording the obvious. The purpose is to allow a reviewing court (and the public) to ascertain that the critical issues before the agency have indeed

been considered and weighed and not overlooked or concealed. Indeed, a reviewing court cannot accord to agency findings the deference to which they are entitled unless such attention is given to at least the critical facts upon which the agency has acted.

■ In the case before us, the Commissioner reached one conclusion on the record prepared before the hearing examiner and the circuit court reached another. We cannot conclude, as did the circuit court, that the Commissioner's conclusion was clearly wrong; neither, however, can we conclude that the Commissioner's conclusion is supported by substantial evidence when there is before us a direct conflict in Trooper Brown's critical testimony, for which we have before us no explanation or evaluation by the hearing examiner or the Commissioner. Accordingly, we hold that where there is a direct conflict in the critical evidence upon which an agency proposes to act, the agency may not elect one version of the evidence over the conflicting version unless the conflict is resolved by a reasoned and articulate decision, weighing and explaining the choices made and rendering its decision capable of review by an appellate court.

In this case, when the circuit court substituted its judgment on the evidence in conflict for that of the agency without either taking additional evidence or remanding the matter to the Commissioner for further consideration, including the possible taking of additional evidence, the court below did not meet the clearly wrong standard for review of the agency decision and abused its discretion.

While the validity of an investigatory stop would be clearly established if a police officer makes the stop after observing a violation of the law, the ambiguity in the record regarding the trooper's observations immediately before the stop, which is not resolved by the findings of fact below, cannot stand as justification for an investigatory stop or as a supplemental fact to be considered in the totality of the circumstances. Accordingly, we reverse and remand this cause to the circuit court with directions that the matter be remanded to the Commissioner to determine in the first instance the propriety of the investi-

gatory stop and for other proceedings consistent with this opinion.

### INSUFFICIENT EVIDENCE

The Commissioner also assigns as error the trial court's holding which states "[a]fter excluding the results of the intoxilyzer test given to the Petitioner [here, the appellee, Ms. Muscatell], there was not sufficient other evidence to establish by a preponderance of the evidence that she was driving a motor vehicle under the influence of alcohol." In light of the remand of this case for further consideration of the propriety of the investigative stop and our clarification here of the admissibility of testimony regarding the HGN test, we need not address this issue at this time. We do note that the issue of the admissibility of the intoxilyzer test was resolved below and is not disturbed by our ruling today. The admissibility of the preliminary breath test results and the field sobriety tests is now dependent upon the propriety of the investigatory stop. With respect to the field sobriety tests, we note the finding of the circuit court that the upset condition of appellee at the time of the conduct of those tests was not considered by the Commissioner in assessing their reliability, and we commend that finding to the Commissioner upon remand, at which time the Commissioner may deal with the issue thus raised in such manner as is deemed appropriate.[9]

For the reasons assigned, we reverse the order of the Circuit Court of Harrison County and remand the case for proceedings consistent with this opinion.

Reversed and remanded with directions.

WORKMAN, Justice, dissenting.

I respectfully dissent from the majority opinion because it fails to address and to apply the appropriate standard for determining the constitutionality of an investigatory stop.

First, a review of the facts: Between 5:30 and 6:00 p.m., the trooper received a radio call[1] from the State Police Communication Office in Shinnston, West Virginia, requesting him to be on the lookout for a small, light blue vehicle traveling toward Clarksburg from the Grafton area. He was also informed that the driver of the vehicle was named Beverly S. Jackson Muscatell, and that she might have been involved in a hit and run accident, and might be under the influence of alcohol. Next, shortly after 6:00 p.m., the trooper observed a woman driving a light blue small car, thought to be a Dodge Omni or Plymouth Horizon, traveling toward Clarksburg. The trooper also testified that the vehicle "straddled or went across the center line one time before coming back to the driving lane." The trooper then pulled the car over and asked the driver if her name was Beverly, to which she affirmatively replied. Additionally, he looked at her operator's license. Even though the trooper observed no damage to the vehicle, while questioning her as to her name, he did detect the strong odor of alcohol "from the vehicle and from her person as she was speaking to me briefly there about the incident...."

The majority analyzes whether the initial stop was valid utilizing the following law enunciated in syllabus point five of the opinion:

> For a police officer to make an investigatory stop of a vehicle the officer must have an articulable reasonable suspicion that a crime has been committed, is being committed, or is about to be committed. In making such an evaluation, a police officer may rely upon an anonymous call if subsequent police work or other facts support its reliability, and, thereby, if is sufficiently corroborated to justify the investigatory

---

9. We note the distinction between reasonable suspicion justifying an investigatory stop and probable cause to effect a lawful arrest. On remand, the issue of probable cause for appellee's arrest will not be confronted if the investigatory stop is found to be improper and need be considered only if the stop is found to have been valid.

1. As the majority notes, it was later learned that the anonymous call came from Trooper Paul Ferguson, a State Police officer in Grafton, West Virginia, who was investigating a reported hit-and-run accident. The accident ultimately turned out to be a family argument that did not involve a hit-and-run incident.

stop under the reasonable-suspicion standard.

The majority ultimately concludes, however, that a remand is necessary because the record was inadequately developed below. This decision to remand is not premised upon the above-mentioned law, it is premised upon the majority's determination that the trooper's subjective intent for making the stop is vital to the constitutional validity of the stop. As the majority stated "[i]t must be determined that the stop is not justified by mere pretext that would mock the constitutional protections to which all citizens are entitled."[2] Simply stated, the majority is incorrect in its examination of this issue in the context of what the trooper's subjective intent was at the time he stopped the vehicle. Contrary to the majority opinion, an examination of the law reflects that it matters not whether the trooper stopped the vehicle due to a traffic violation or whether he stopped the vehicle based on an anonymous tip. Either ground is sufficient to support the stop, because the United States Supreme Court has very recently stated that the decision should turn on whether the trooper's conduct in stopping the vehicle was reasonable when the circumstances of that stop are viewed objectively.[3] *See Whren v. United States*, —— U.S. ——, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *State v. Todd Andrew H.*, 196 W. Va. 615, 621 n. 9, 474 S.E.2d 545, 551 n. 9 (1996).

There is no bright line for determining when an investigatory stop crosses the line and becomes constitutionally unreasonable. The United States Supreme Court has clearly stated that "[m]uch as a 'bright line' would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experiences must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). Therefore, whether a stop is valid depends on all the surrounding circumstances, and each case must be decided on its own facts. Thus, in the present case, the factfinder had to resolve the abstruse issue of reasonable articulable suspicion in the context of a stop of a moving vehicle on an isolated stretch of highway by a police officer faced with an individual who may have been drunk, who may have been the culprit of a hit and run and who the officer personally observed as driving across the center line.

Nevertheless there are some standards that should be honored. When reviewing the legality of a vehicular stop, we are to accept the factfinder's assessment of the evidence unless it is clearly erroneous and review de

---

**2.** I could perhaps accept the majority's ultimate resolution of this case if the opinion did not erroneously venture into the area of pretext as possible basis for invalidating an otherwise lawful stop. The focus of the inquiry should be quite specific: does the record evidence demonstrate that the officer had a reasonable articulable suspicion to stop the vehicle. The majority resolves to proceed to inject into West Virginia criminal jurisprudence a new dimension of subjectivity in an area already overburdened with confusing constitutional standards. This opinion certainly and unnecessarily adds to the confusion.

**3.** The application of the objective standard involves a determination of whether a reasonable officer could have made a legal stop anyway, apart from his or her subjective suspicions. We do not examine the subjective motivations of individual officers or their particular job assignments, both of which are subject to change at any time. Instead, we should concentrate simply upon the conduct of the suspect, the information possessed by the officer at the time of the stop, and whether a reasonable officer with authority to do so would stop the vehicle when confronted

with such conduct and information. *See Scott v. United States*, 436 U.S. 128, 137, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978) (stating that "almost without exception in evaluating alleged violations of the Fourth Amendment the Court has first undertaken an objective assessment of an officer's actions in light of the facts and circumstances known to him"). Thus, expanding upon the concepts enunciated by the United States Supreme Court in *Scott* and *Whren v. United States*, —— U.S. ——, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), in order to determine the lawfulness of a stop, a court need only find that (1) under the circumstances a reasonable officer would stop the vehicle for purposes of investigating a violation of a specified law, and (2) it was within the detaining officer's scope of responsibility to enforce that law. A court need not answer the more specific question of what was the reason that motivated this specific police for effectuating the stop. To do otherwise, would impose a particular examination, akin to a subjective test, which expressly was rejected in *Whren.* As will be discussed later in the main text, if the majority had applied this standard, a remand would have been unnecessary.

novo the ultimate determination of reasonableness under our Constitution. *State v. Lilly*, 194 W.Va. 595, 461 S.E.2d 101 (1995); *State v. Stuart*, 192 W.Va. 428, 452 S.E.2d 886 (1994); *see also Ornelas v. United States*, — U.S. —, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). We have stated repeatedly that the weight given to the evidence as well as the inferences and conclusions drawn therefrom, are matters for the factfinder. Once a decision has been reached below, we interpret the evidence from a coign of vantage most favorable to the winning side, in this case the Commissioner. *State v. LaRock*, 196 W.Va. 294, 304, 470 S.E.2d 613, 623 (1996). More pertinent here, if the lower tribunal "did not make the necessary findings, the matter may either be remanded with appropriate directions or the [lower tribunal's] denial of a motion to suppress upheld if *there is any reasonable view of the evidence to support it.*" *State v. Lacy*, 196 W.Va. 104, 110, 468 S.E.2d 719, 725 (1996) (emphasis added); *see State v. Farley*, 192 W.Va. 247, 452 S.E.2d 50 (1994).

Unquestionably, a routine traffic stop is a seizure under both Fourth Amendment and the West Virginia Constitution. Such a stop is analyzed as an investigative detention, which need only be supported by a reasonable and articulable suspicion that the person and vehicle seized is engaged in criminal activity. *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (finding that a vehicular stop and frisk of car's occupant is governed by reasonable suspicion set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *Stuart*, 192 W.Va. at 431–32, 452 S.E.2d at 889–90 (finding that brief investigative stop is permissible when investigating officers have reasonable suspicion grounded in articulable facts and person stopped is involved or has been engaged in criminal activity).[4] We employed a two-step inquiry when evaluating such investigative detentions, considering first "whether the officer's action was justified at its inception", and second, "whether [the action] was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879.

Our recent opinions, as well as the recent opinions of the United States Supreme Court, dispose of the Appellant's argument that the initial stop was of her vehicle was pretextual and therefore invalid. Under correct constitutional analysis a traffic stop is valid if the stop is based on an observed traffic violation *or* if the police officer has reasonable suspicion to believe that the driver of the vehicle is involved in criminal activity. It is thus irrelevant whether the particular officer "would" have stopped the vehicle according to general practices of police officers or police departments. It is equally irrelevant whether the officer may have other subjective motives for stopping the vehicle. As applied to the trooper's stop of appellee's vehicle, the above standards compel the conclusion that the Commissioner was not clearly wrong in determining that the stop was valid.

In the instant case, the trooper testified on direct examination that the reason he stopped the Appellee's vehicle was because he observed the vehicle "briefly straddling or crossing the centerline." On cross-examination, however, the majority noted that "the trooper appears to have testified that the information upon which he relied at the time of the stop was limited to the information contained in the anonymous phone call." Based on this conflicting testimony, the majority concludes that the "observations of the trooper immediately before the stop are critical to the legality of the stop." Such conclusion, which translates to an examination of the police officer's motivation for stopping the vehicle, is in direct contravention of the United States Supreme Court's most recent pronouncement on this issue in *Whren*. *See* — U.S. at — - —, 116 S.Ct. at 1773–74; *see also United States v. Robinson*, 414 U.S. 218, 221 n. 1, 94 S.Ct. 467, 470 n. 1, 38 L.Ed.2d 427 (1973) (stating that traffic-

---

**4.** It is well-established that the constitution does not prohibit all seizures but only those that are unreasonable. *See Lacy*, 196 W.Va. at 111–12, 468 S.E.2d at 726–27. An investigative stop under *Terry*, a brief, nonintrusive stop by police, is a seizure within the federal and West Virginia Constitution but it requires only that the officers have specific and articulable facts that give rise to a reasonable suspicion that a person has committed or is committing a crime.

violation arrest would not be rendered invalid by fact that it was "mere pretext for a narcotics search").

In *Whren*, plainclothes policemen patrolling an area known for its drug activity in an unmarked car observed a truck driven by the petitioner Brown waiting at a stop sign for an unusually long period of time. The truck suddenly, without signaling, sped off at an "unreasonable" speed. —— U.S. at ——, 116 S.Ct. at 1772. The policemen stopped the vehicle, assertedly to warn the driver about traffic violations. Upon approaching the truck, an officer observed plastic bags of crack cocaine in the petitioner Whren's hands. The petitioners were arrested. Prior to trial, they moved to suppress the evidence maintaining that the stop had not been justified by either reasonable suspicion or probable cause to believe that they were engaged in illegal drug-dealing activity. *Id.*

In upholding the investigatory stop, the Supreme Court stated that the constitutional reasonableness of traffic stops does not depend on the "actual motivations of the individual officers involved." *Id.* at ——, 116 S.Ct. at 1774. In so holding, the *Whren* court relied upon the previously established principle that: " 'the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.' " *Id.* at ——, 116 S.Ct. at 1774 (quoting *Scott*, 436 U.S. at 138, 98 S.Ct. at 1723).

In ascertaining whether the trooper's conduct in the case sub judice was reasonable when the circumstances leading to the investigatory stop are viewed objectively, I turn to other Supreme Court cases that are factually analogous. For instance, in *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), a police officer, while on duty in a high-crime area, was approached by an informant who told him that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist. *Id.* at 144–

45, 92 S.Ct. at 1922–23. The officer approached the vehicle to investigate the informant's report, tapped on the car window and asked the occupant to open the door. The occupant rolled down the car window, and the officer reached into the car and removed a fully loaded revolver from the occupant's waistband, where the informant indicated it would be. The weapon had not been visible to the officer from outside the vehicle. The occupant was arrested and charged with unlawful possession of a pistol.[5] *Id.* at 145, 92 S.Ct. at 1922–23.

The respondent argued that the initial seizure of the pistol was not justified by the informant's tip. *Id.* In rejecting the respondent's argument, the Supreme Court stated that reasonable cause for a stop and frisk can be based on information supplied by another person. *Id.* at 147, 92 S.Ct. at 1923–24. Specifically, the *Adams* court stated that "while the Court's decisions indicate that this informant's unverified tip may have been insufficient for a narcotics arrest or search warrant, the information carried enough indicia of reliability to justify the officer's forcible stop of Williams." *Id.* (citations omitted).

Likewise, in *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), the police received an anonymous telephone tip that the respondent would be leaving a particular apartment at a particular time in a particular vehicle. The anonymous caller also told the police the motel the respondent would go to and that she would be in possession of cocaine. The police immediately went to the apartment building and saw the vehicle described by the caller. They then observed the respondent leave the building and get into that vehicle. They proceeded to follow her along the most direct route to the motel described by the caller, however, they stopped her vehicle just before she reached the motel. A consensual search of the car revealed drugs. The respondent ultimately

---

**5.** A search incident to arrest led to the discovery of substantial quantities of heroin on the occupant's person and car. 407 U.S. at 145, 92 S.Ct. at 1922–23.

pleaded guilty[6] to possession of marijuana and cocaine. *Id.* at 327, 110 S.Ct. at 2414–15.

In deciding that an anonymous tip, as corroborated by independent police work, can exhibit a sufficient indicia of reliability to furnish reasonable suspicion for an investigatory stop, the Supreme Court reiterated that in cases involving reasonable suspicion, " '[t]he Fourth Amendment [only] requires "some minimal level of objective justification" for making the stop.' " *Id.* at 329–30, 110 S.Ct. at 2416 (quoting *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989)). Further, the *White* court indicated that in order to establish whether the anonymous tip was sufficiently corroborated, the totality of the circumstances approach was to be applied, "taking into account the facts known to the officers from personal observation, and giving the anonymous tip the weight it deserved in light of its indicia of reliability as established through independent police work." 496 U.S. at 330, 110 S.Ct. at 2416.

The Supreme Court concluded that the anonymous tip in *White* established reasonable suspicion, stating that "[i]t is true that not every detail mentioned by the tipster was verified, such as the name of the woman leaving the building or the precise apartment from which she left; but the officers did corroborate that a woman left the 235 building and got into the particular vehicle that was described by the caller." *Id.* at 331, 110 S.Ct. at 2416–17. Moreover, the Court found it important that " 'the anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted.' " *Id.* at 332, 110 S.Ct. at 2417 (quoting *Illinois v. Gates,* 462 U.S. 213, 245, 103 S.Ct. 2317, 2335–36, 76 L.Ed.2d 527 (1983)).

It is true that an anonymous tip, considered wholly without regard to its content or context, is not deemed an adequate basis for a *Terry* stop. *See Stuart,* 192 W.Va. at 431, 452 S.E.2d at 889. However, where the tip is to some extent corroborated, as in this case, where the police observed a vehicle fitting the description of the tip and observed suspicious or unlawful driving of the vehicle, and where exigent circumstances exist, the situation is different. While there is still a chance that the tip is a lie, the Constitution does not require as a prerequisite for an investigative stop that an officer be certain. Nor should we overlook the additional factor that the driver was alleged to have been driving under the influence of alcohol. Drunk drivers are so dangerous to the peace and welfare of the community that a tip that a person is under the influence while operating a vehicle should be entitled to special consideration. As a realistic matter this information coupled with observed illegal driving, presents a compelling case for an investigative stop.

Reviewing the legality of the investigatory stop in the instant case in light of *Whren, Adams* and *White,* it is evident that the trooper's conduct in stopping the vehicle was reasonable when the circumstances surrounding the stop are viewed objectively. First, the reasonable suspicion standard was certainly met since the decision to stop the vehicle could clearly be based on information received from State Police Communication Office in Shinnston. *See United States v. Moore,* 817 F.2d 1105, 1107 (4th Cir.), *cert. denied,* 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 396 (1987) (finding that call by dispatcher suggests existence of reasonable suspicion, and finding that police officer is not constitutionally required to be "certain" that a crime has occurred when he makes a stop). To the contrary, the failure of the police officer to take appropriate action to stop a properly identified vehicle would constitute a dereliction of duty. *See Taft v. Vines,* 70 F.3d 304, 312 (1995) ("Indeed … to have refused to act on the radio dispatch order to stop the car, would have been to be negligent in the their duties."); *United States v. Randall,* 947 F.2d 1314, 1318 (7th Cir.1991) (finding that limits of *Terry* not exceeded when police converged on and stopped suspect's vehicle when car matched description in radio dispatch of vehicle involved in a crime). Similarly, the trooper's conduct was equally justified under the reasonable suspicion standard if the stop of the vehicle was

---

**6.** The respondent's guilty plea was conditioned on her right to appeal the denial of her suppression motion. 496 U.S. at 327–28, 110 S.Ct. at 2414–15.

604

precipitated by the trooper's observation of a traffic violation.

Thus, to hinge the opinion on the trooper's "conflicting"[7] testimony as to why he stopped the vehicle, is to issue a ruling based on the trooper's subjective intent, which is irrelevant. Absent clear error, an appellate court should treat the factfinder's choice of which witnesses and what testimony to believe as conclusive on appeal. For all of these reasons, the Commissioner's decision on this issue should have been upheld. In remanding this case to resolve "the ambiguity in the record regarding the trooper's observations immediately before the stop," the majority applies the wrong standard for determining whether the investigatory stop was legal, and stretches the boundaries of Section 6, Article III of the West Virginia Constitution to make our boundaries inconsistent with the Fourth Amendment. I must dissent.

7. The trooper's testimony on cross-examination did not conflict with his testimony on direct; rather, it expanded upon it.