# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Darrick Cox,**
**Plaintiff Below, Petitioner**

**vs)  No.  18-0330** (Kanawha County 17-AA-97)

**Town of Belle, West Virginia,**
**Defendant Below, Respondent**

**FILED**

**March 11, 2019**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Darrick Cox, Respondent Town of Belle's former police chief, by counsel John F. Dascoli, appeals the March 15, 2018, order of the Circuit Court of Kanawha County that reversed the order of the Town of Belle's Police Service Commission and reinstated respondent's decision to terminate petitioner's employment. Respondent by counsel John R. Teare, Jr., filed a response in support of the circuit court's order. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On December 12, 2016, the Charleston Gazette reported that Petitioner Darrick Cox, then respondent's police chief, was under federal investigation. That same day, respondent's mayor placed petitioner on paid administrative leave. The mayor claims he told petitioner that he (petitioner) was no longer allowed in respondent's Town Hall, where respondent's police department is located. On January 11, 2017, respondent's mayor demoted petitioner to the rank of patrolman, and notified petitioner that he would remain on administrative leave during the federal and local investigations of petitioner's alleged misconduct. On June 6, 2017, respondent served petitioner with a "Notice of Termination, Statement of Charges and Notice of a Right to a Hearing." The Statement of Charges alleged insubordination, embezzlement of evidence, falsifying departmental records, sale/purchase of a firearm without authorization by the owner of the firearm, and use of official position for personal gain that is prohibited by the West Virginia Ethics Act.

Petitioner waived his right to a pre-disciplinary hearing and appealed his termination directly to respondent's Police Civil Service Commission (the "Commission"). The Commission convened a hearing on October 25, 2017. During opening statements, respondent's attorney claimed, "it's really two issues here": First, when the mayor placed petitioner on administrative leave, he told petitioner "not to be within the [police department] office or Town Hall" and petitioner violated that directive. Second, petitioner violated police department policy by purchasing a gun that had been evidence in a suicide case.

1

At the Commission hearing, respondent's mayor testified that when he placed petitioner on administrative leave on December 12, 2016, he told petitioner that he (petitioner) was not allowed in Town Hall while he was on administrative leave. The mayor further testified that when he learned petitioner was in Town Hall on December 21, 2016, he sent a letter to all personnel, including petitioner, instructing that petitioner was not allowed in Town Hall while he was on administrative leave.

Respondent's police officer, David Puffinbarger, testified that: (1) he asked petitioner to come to Town Hall on December 21, 2016, (while petitioner was on administrative leave) to help him prepare a computerized schedule; (2) petitioner complied and was in Town Hall for "[l]ess than ten minutes" helping him with the schedule; (3) he did not know petitioner was not supposed to be in Town Hall; and (4) the following week, he received a memo from the mayor that petitioner was not allowed in Town Hall while petitioner was on administrative leave.

The next witness was the mother of a decedent who committed suicide with the gun at issue in this case. The decedent's mother testified that she asked the mayor, petitioner, and the new police chief for the gun used by the decedent in his suicide, but was told it could not be returned to her.

The decedent's girlfriend testified that she purchased the gun and gave it to the decedent, that the gun was registered in the decedent's name, and, that following the decedent's death, she did not know the decedent's mother wanted the gun. The girlfriend also testified that petitioner called her, told her the gun was ready to be released, and that he could release it to her. She testified that she told petitioner she did not want the gun and that petitioner then offered to buy the gun from her for $150. She stated she signed a release for the gun and petitioner paid her $150. Thereafter, respondent entered evidence showing that the market value of the gun was about $300.

Respondent's new police chief testified that he found the gun and the girlfriend's release for the gun in the police department's "gun locker."

Petitioner testified that he was not notified that he was not allowed in Town Hall until he received the mayor's letter so notifying him, which was after he helped Officer Puffinbarger on December 21, 2016, with the computerized scheduling. Regarding the decedent's gun, petitioner testified as follows: The decedent's death was investigated and determined to be a suicide; thus, no crime was committed. He issued a memo instructing the officer who investigated the suicide to place the gun in the gun locker so it could be returned to the owner. The decedent's girlfriend came to the police station, saw the gun, and said, "I don't want this." He told the girlfriend he could keep the gun at the police station until she wanted it. Later, the girlfriend approached petitioner, told him she did not want the gun, and asked if he wanted to buy it from her. He knew the girlfriend and her family and wanted to help. He also believed she was the gun's lawful owner, so he agreed to buy the gun. The girlfriend signed the release stating that she was the gun's owner and he paid her $150 for the gun. However, he never took possession of the gun and, instead, left it in the gun locker at the police station along with the girlfriend's release. Petitioner also admitted that he might have made a "mistake" in purchasing the gun, but claimed he had done nothing that should cause him to lose his job.

2

On cross-examination, petitioner identified the "Belle Police Department Policy and Procedure Manual" (the "Police Manual"). The "Processing Property" section of the Police Manual provides:

> Property or evidence which has been discovered, gathered, or received in connection with departmental responsibilities will be processed in accordance with established departmental procedures. Members shall not convert to their own use, manufacture, conceal, falsify, destroy, remove, tamper with or withhold any property or evidence found in connection with an investigation or other police action, except in accordance with established departmental procedures.

Finally, petitioner testified that "[t]o my knowledge, I did not speak with [the decedent's mother] regarding the weapon. . . . To my knowledge, [the decedent's mother] never requested the weapon."

In its November 7, 2017, order, the Commission found petitioner to be a "truthful" and "credible" witness, but made no findings regarding the credibility of any of the other witnesses whose testimony was contrary to petitioner's testimony. The Commission also found petitioner did not violate any order not to be in Town Hall following his suspension because such an order "was never given." With regard to petitioner's purchase of the decedent's gun, the Commission noted that the Police Manual "appears to prohibit a Bell[e] Police Officer from purchasing evidence in a case." However, the Commission found that when petitioner purchased the gun it was no longer "evidence in a case." Thus, the Commission concluded petitioner did not violate the provisions of the Police Manual by purchasing the gun. The Commission then ordered respondent to reinstate petitioner to his job and granted petitioner's motion for back pay and attorney's fees.

On December 18, 2017, the Commission entered its final order, in which it assessed petitioner's attorney's fees in the amount of $4,187.50 against respondent.

Respondent filed an appeal in the circuit court. By ordered entered March 15, 2018, the circuit court reversed the Commission's order. The circuit court found: (1) the evidence at trial established that the Police Manual prohibited petitioner from converting to his own use a weapon seized as evidence in a criminal investigation; (2) petitioner used his public office for private gain in the gun sale transaction in violation of West Virginia Code § 6B-2-5(b); and (3) petitioner failed to comply with the requirements for the disposition of firearms in the custody of a police department in violation of West Virginia Code § 36-8A-5.

Petitioner now appeals the circuit court's order. In appeals regarding a decision rendered by a police civil service commission, the circuit court applies the following standard:

> "A final order of a police civil service commission based upon a finding of fact will not be reversed by a circuit court upon appeal unless it is clearly wrong or is based upon a mistake of law." Syl. pt. 1, *City of Logan v. Dingess*, 161 W.Va. 377, 242 S.E.2d 473 (1978), *quoting*, Syl. pt. 1, *Appeal of Prezkop*, 154 W.Va. 759, 179 S.E.2d 331 (1971).

3

Syl*., Kendrick v. Johnson*, 167 W. Va. 269, 279 S.E.2d 646 (1981). "In cases where the circuit court has amended the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*." Syl. Pt. 2, *Muscatell v. Cline*, 196 W. Va. 588, 474 S.E.2d 518 (1996).

Petitioner raises five assignments of error on appeal. Petitioner first argues that the circuit court abused its discretion in reversing the Commission's decision that petitioner did not violate the provisions of the Police Manual in purchasing a weapon that was no longer "evidence" in a case. Specifically, the Commission found:

> When questioned about the "Processing Property" provision of the [Police Manual] . . . that appears to prohibit [an officer] from purchasing evidence in a case, [petitioner] asserted that the gun he purchased had been released to the apparent owner and therefore was no longer evidence in the case. The Commission notes that the suicide took place in 2014 and the gun was purchased in 2015. The suicide case was concluded and the gun had been released to the apparent owner of the gun in 2016 . . . . The Commission agrees with the testimony of [petitioner] that the gun was no longer evidence and therefore the purchasing of the gun was not a violation of Belle Police Department Policy.

Petitioner concurs with this reasoning and, based upon it, argues that the circuit court erred in finding that he violated the Police Manual.

We disagree. As noted above, the Police Manual provides that "[*p*]*roperty* or evidence which has been discovered, gathered, or *received in connection with departmental responsibilities* will be processed in accordance with established departmental procedures." (Emphasis added.) Thus, even if the gun was no longer "evidence" once the decedent's death was ruled a suicide, it was still "property . . . received in connection with departmental responsibilities[.]" The "Processing Property" section further provides that "[m]embers shall not convert to their own use . . . any property or evidence found in connection with an investigation or other police action[.]"  Here, the evidence adduced at the Commission hearing showed that the gun petitioner purchased was, in fact, "property" found in connection with the investigation of the decedent's suicide and that petitioner converted the property to his own use when he purchased the gun from the decedent's girlfriend. Thus, the circuit court did not err in finding that petitioner violated the "Processing Property" section of the Police Manual when he purchased the gun.

Petitioner's second assignment of error is that the circuit court erred in determining he violated the West Virginia Ethics Act, West Virginia Code § 6B-2-5(b)(1), which provides, in relevant part, "[a] public official or public employee may not knowingly and intentionally use his or her office or the prestige of his or her office for his or her own private gain or that of another person." Petitioner argues that respondent never specifically asked the Commission to determine whether petitioner violated West Virginia Code § 6B-2-5(b), regarding use of public office for private gain.

In the order on appeal, the circuit court accurately notes that the Commission failed to render any decision regarding respondent's West Virginia Code § 6B-2-5(b) charge against petitioner. That charge alleged petitioner's actions raised

> the criminal specter of embezzlement, filing of falsified official documents, and the sale of a firearm which was, for all intents and purposes, a stolen firearm. Moreover, West Virginia law, and general standards of ethics prohibit you from using your official position as a police officer for personal gain and there are serious concerns about the handling of an item of evidence even after a determination that no crime was committed.

The testimony at the hearing showed that: (1) the decedent shot and killed himself with his gun; (2) the decedent died intestate; (3) the decedent's mother asked petitioner for the gun, but petitioner refused her request; (4) the decedent's girlfriend never asked that the gun be released to her; (5) petitioner asked the officer who investigated the suicide to sign a form releasing the gun to the gun locker; (6) days later, petitioner asked to buy the gun from the decedent's girlfriend; (7) petitioner had the decedent's girlfriend sign a release for the gun and then purchased it from her for $150; and (8) the fair market value of the gun was about $300. On this record, and given that petitioner was charged with violating West Virginia Code § 6B-2-5(b), we find that the circuit court did not err in finding petitioner used his official position for private gain in violation of West Virginia Code § 6B-2-5(b).

Petitioner's third assignment of error is that the circuit court erred in determining that he failed to comply with West Virginia Code § 36-8A-5 (regarding the disposition procedure for firearms in police custody), because that issue was not raised below. We disagree and find no error. West Virginia Code § 36-8A-5(c) requires a police chief, like petitioner, to "use best efforts to determine if [a] firearm has been lost by, stolen or otherwise unlawfully obtained from an innocent owner, and if so, [to] return the firearm to its innocent owner[.]" Further, West Virginia Code § 36-8A-5(a) requires that where a firearm is "forfeited or abandoned . . . , [it] shall be transferred to the State Treasurer for disposal[.]" Finally, West Virginia Code § 36-8A-5(e)(3) prohibited petitioner from bidding on the gun if it was eligible for sale at a public auction. Thus, the circuit court was well within its discretion in applying the undisputed facts in this case to this clear statutory language and in concluding that petitioner violated West Virginia Code § 36-8A-5.

Petitioner next argues that the circuit court erred in determining respondent met its burden of proving that petitioner committed seriously wrongful conduct by a civil service employee. *See* Syl. Pt. 5, *Mangum v. Lambert*, 183 W. Va. 184, 394 S.E.2d 879 (1990) (stating "[s]eriously wrongful conduct by a civil service employee can lead to dismissal even if it is not a technical violation of any statute. The test is not whether the conduct breaks a specific law, but rather whether it is potentially damaging to the rights and interests of the public."). Petitioner also argues that the circuit court failed to give deference to the Commission's decision. Petitioner highlights that "Civil Service Commission members, like juries, are usually representatives of the community-at-large; in addition, given that they draw on a fund of knowledge and expertise all their own, [a reviewing court] must also give great deference to the Commission's selection of remedy." *In re Queen*, 196 W. Va. 442, 446, 473 S.E.2d 483, 487 (1996).

5

We concur that the circuit court was to give deference to the Commission's selection of a remedy. However, in this case, the evidence supported the circuit court's reversal of the Commission's order, and its finding that respondent met the burden of establishing that petitioner (1) violated the provisions of the Police Manual when he converted a gun seized as part of a criminal investigation for his own use, (2) violated the West Virginia Code when he failed to properly dispose of the gun, and (3) illegally used his public office for personal gain in purchasing the gun. Thus, respondent proved that petitioner committed seriously wrongful conduct.

Finally, petitioner argues that the circuit court erred in determining that the Court requires a more thorough credibility analysis than that done by the Commission. We disagree. As noted above, the Commission found petitioner to be a "truthful" and "credible" witness, but made no findings regarding the credibility of any of the other witnesses whose testimony was contrary to petitioner's testimony. As we said in *In re Queen*,

> administrative agencies should make specific and separate findings of fact, opinions, and conclusions of law that will address all material aspects of the case, including credibility issues. Important liberty and property interests, not to mention significant public interests, are at stake in these proceedings and it is the obligation of administrative agencies to give the parties the full benefit of their reasoning by setting forth their findings in suitable detail in their final orders.

196 W. Va. at 449 n.6, 473 S.E.2d at 490 n.6. Moreover,

> "[w]here there is a direct conflict in the critical evidence upon which an agency proposes to act, the agency may not elect one version of the evidence over the conflicting version unless the conflict is resolved by a reasoned and articulate decision, weighing and explaining the choices made and rendering its decision capable of review by an appellate court."

Syl. Pt. 6, *Muscatell*. Here, the witnesses' versions of events were clearly at odds. Nevertheless, the Commission elevated petitioner's testimony over the conflicting testimony of other witnesses absent reasoned and articulate decision, weighing and explaining the choices made and rendering its decision capable of review by an appellate court. Accordingly, we find no error.

For the foregoing reasons, we affirm the circuit court's March 15, 2018, order reversing the Commission's November 7, 2017, order reinstating petitioner to his job and granting petitioner's motion for back pay and attorney's fees.

Affirmed.

**ISSUED:** March 11, 2019

**CONCURRED IN BY:**

Chief Justice Elizabeth D. Walker
Justice Margaret L. Workman
Justice Tim Armstead
Justice Evan H. Jenkins
Justice John A. Hutchinson