632 S.E.2d 59

**LOYAL ORDER OF MOOSE, Martinsburg Lodge No. 120, Petitioner Below, Appellant**

v.

**STATE TAX COMMISSIONER, Respondent Below, Appellee.**

No. 32842.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 14, 2006.

Decided May 18, 2006.

Dissenting Opinion of Justice STARCHER July 11, 2006.

Michael E. Caryl, Esq., Bowles Rice McDavid Graff & Love, Martinsburg, Heather G. Harlan, Esq., Bowles Rice McDavid Graff & Love, Charleston, Attorneys for Appellant.

Darrell V. McGraw, Jr., Esq., Attorney General, A.M. Pollack, Esq., Assistant Attorney General, Charleston, Attorneys for Appellee.

PER CURIAM:

This case is before this Court upon appeal of a final order of the Circuit Court of Berkeley County entered on December 8, 2004. In that order, the circuit court upheld an administrative decision of the appellee, the State Tax Commissioner, denying an application for renewal of an annual charitable bingo and raffle license to the appellant, the Loyal Order of Moose, Martinsburg Lodge No. 120 (hereinafter, "Moose Lodge"). In this appeal, the Moose Lodge contends that its license was denied based upon an erroneous interpretation of the law. After reviewing the facts of the case, the issues presented, and the relevant statutory and case law, this Court reverses the decision of the circuit court.

## I.

## FACTS

The Moose Lodge is a local unit of a fraternal organization operating under a

charter granted by its national headquarters. On July 23, 1999, the State Tax Department, through its Commissioner, issued a "Notice of Intent to Suspend Charitable Bingo and Raffle Licenses and Notice of Hearing" to the Moose Lodge. The Moose Lodge, without representation of counsel, voluntarily elected to waive its right to the scheduled hearing. The Moose Lodge then sent a letter informing the Commissioner that it intended to contact the State Legislature to try to clarify the laws surrounding the Commissioner's interpretation of W.Va.Code § 47–21–15 (1996) which deals with the use of the proceeds of authorized raffles.

Based upon the Moose Lodge's waiver of its right to the hearing, a six-month suspension of its charitable raffle license was issued and scheduled to commence on September 15, 1999. However, the effective date was deferred until September 29, 1999, by notice dated September 13, 1999. On October 14, 1999, rather than undergo the six-month suspension of its charitable raffle license, the Moose Lodge entered into an Alternative Disposition Agreement (hereinafter, "the Agreement") with the Commissioner.

In the Agreement, executed under the advice of the Moose Lodge's counsel, the Moose Lodge, believing it had given up its right to challenge the underlying issues due to its waiver of the earlier hearing, admitted committing the violations set forth in the "Notice of Intent to Suspend Charitable Bingo and Raffle Licenses" which included, among other things, utilizing charitable raffle proceeds in violation of the West Virginia Charitable Raffles Act, W.Va.Code § 47–21–1, et seq.

Pursuant to the Agreement, the Moose Lodge agreed to comply with the charitable gaming laws during the three-year abeyance period and to contribute $81,018.00 from its general funds to qualified charitable or public service purposes. The Agreement specifically provided that none of the $81,018.00 penalty,

> shall be drawn from general funds of the Licensee, and shall not be drawn or derived from the charitable raffle accounts of the Licensee or any other entity. The said amount shall be separate from and in addition to any proceeds derived from the Li-

censee's charitable raffle operations for the 1999 and 2000 license years or other operations under the charitable gaming laws.

The Moose Lodge, however, due to the claimed potential hardship it would have caused its organization, failed to make the contribution. Accordingly, on October 14, 2001, the Moose Lodge defaulted on the Agreement, resulting in the Commissioner issuing a six-month suspension of the Moose Lodge's charitable raffle license effective October 30, 2001. The Moose Lodge did not contest the license suspension.

During the previous month, on September 18, 2001, agents of the Commissioner's Criminal Investigation Division (hereinafter, "CID"), along with an Alcohol and Beverage Control (hereinafter, "ABC") investigator, conducted a survey at the Moose Lodge's premises, wherein their charitable games were inventoried. The CID alleged that the Moose Lodge was in possession of several raffle games for which it could not produce invoices or other supporting documents. At the time of the survey, a member of the Moose Lodge told an investigator that the games must have been given to the Moose Lodge by one of the salesman from its raffle distributor. On December 23, 2001, another survey was conducted by CID and ABC investigators, wherein they witnessed the conducting of raffle games upon entrance to the Moose Lodge's building.

On January 10, 2002, as a result of the violation of the charitable gaming laws, including conducting raffles while its license had been suspended, the Commissioner ordered a revocation of the Moose Lodge's license, replacement of its officers, and a payment of a civil monetary penalty. On April 24, 2002, the Moose Lodge protested and appealed the order. Subsequently, the Commissioner gave notice to the Moose Lodge that it had decided to withdraw that particular legal action. On May 30, 2002, the Commissioner formally moved to dismiss, with prejudice, the matter against the Moose Lodge. On April 25, 2002, however, in lieu of pursuing formal charges against the Moose Lodge for its alleged past violations, the Commissioner instead decided to deny the Moose Lodge's 2002 renewal application for

its license. The Moose Lodge then protested the denial of its license, and on February 13, 2003, the Commissioner issued its Final Administrative Decision upholding the denial of the Moose Lodge's 2002 license renewal. On December 8, 2004, the Circuit Court of Berkeley County upheld the administrative decision and determined that the denial of the Moose Lodge's 2002 license renewal was valid. This appeal followed.

## II.

## STANDARD OF REVIEW

■■■ The Moose Lodge contends that the circuit court erred in upholding the decision of the State Tax Commissioner which denied its application for renewal of an annual charitable bingo and raffle license. This Court applies the same standard of review that the circuit court applied to the Commissioner's administrative decision, i.e., giving deference to the Tax Commissioner's purely factual determinations and giving *de novo* review to legal determinations. *See Choma v. West Virginia Div. of Motor Vehicles,* 210 W.Va. 256, 258, 557 S.E.2d 310, 312 (2001). In Syllabus Point 2 of *Choma,* we held that: "On appeal of an administrative [decision] ... findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong. Syllabus Point 2 (in part), *Muscatell v. Cline,* 196 W.Va. 588, 474 S.E.2d 518 (1996)." Likewise, "[e]videntiary findings made at an administrative hearing should not be reversed unless they are clearly wrong." Syllabus Point 1, *Francis O. Day Co., Inc. v. Director, Div. of Envtl. Prot.,* 191 W.Va. 134, 443 S.E.2d 602 (1994).

## III.

## DISCUSSION

In this case, the appellant Moose Lodge argues that the appellee State Tax Commissioner improperly denied its application for renewal of its annual charitable bingo and raffle license in 2002 based upon an erroneous interpretation of the law. Moreover, the Moose Lodge maintains that both the Commissioner and the circuit court failed to address the "use of proceeds" rule as set forth in W.Va.Code § 47–21–15 which deals with how organizations may use the proceeds of authorized raffles. Specifically, the Moose Lodge states that the circuit court erred by acquiescing in the Commissioner's ruling that based on the fact that the Moose Lodge is not a veterans organization, any analogy to the veterans organizations' use of charitable proceeds was not relevant to the appeal of the Commissioner's February 14, 2003, Final Administrative Decision.

The Moose Lodge contends that the Commissioner incorrectly concluded that licensees like the Moose Lodge may not use *any* part of their charitable raffle proceeds for their own internal operational expenses, while other similar licensees such as local posts of the VFW may use the proceeds in such manner. Thus, the Moose Lodge believes this is contradictory to West Virginia law and amounts to disparate treatment. The Moose Lodge further states that its 1999 waiver of its right to have a hearing and its subsequent execution of the 1999 Alternative Disposition Agreement must be seen as voidable and should not have legitimately served as a basis for the denial of its 2002 license.

■■■ The Commissioner responds that the issue of the denial of the Moose Lodge's raffle license for the year 2002 is obviously moot since the Moose Lodge currently has its charitable bingo and raffle license and it has not asked for, nor can this Court award, monetary damages.

■■■ We have held that, " '[c]ourts will not ordinarily decide a moot question.' Pt. 1, syllabus, *Tynes v. Shore,* 117 W.Va. 355 [185 S.E. 845] [ (1936) ]." Syllabus Point 1, *State ex rel. Hedrick v. Board of Comm'rs of County of Ohio,* 146 W.Va. 79, 118 S.E.2d 73 (1961). In Syllabus Point 1 of *State ex rel. Durkin v. Neely,* 166 W.Va. 553, 276 S.E.2d 311 (1981), we held that:

"Moot questions or abstract propositions, the decision of which would avail nothing in the determination of controverted rights of persons or property are not properly cognizable by a court." Syllabus Point 1, *State ex rel. Lilly v. Carter,* 63 W.Va. 684, 60 S.E. 873 (1908).

Nonetheless, in Syllabus Point 6 of *W. Va. Educ. Ass'n v. Consol. Pub. Retir. Bd.,* 194 W.Va. 501, 460 S.E.2d 747 (1995), we held that:

'Even though an issue may be technically moot, it still may be deserving of judicial resolution by meeting one or more of the following criteria: First, the court will determine whether sufficient collateral consequences will result from determination of the questions presented so as to justify relief. Second, while technically moot in the immediate context, questions of great public interest may nevertheless be addressed for the future guidance of the bar and of the public. Third, issues which may be repeatedly presented to the trial court, yet escape review at the appellate level because of their fleeting and determinate nature, may appropriately be decided.' *Israel by Israel v. West Virginia Secondary Schools Activities Commission,* 182 W.Va. 454, 457, 388 S.E.2d 480, 483 (1989).

In this case, since the Moose Lodge's license has been restored and the numerous penalties levied against it now dismissed, the Commissioner is correct that the issues surrounding this appeal are technically moot. However, having carefully reviewed all the facts of this case, we believe that negative collateral consequences of the 2002 denial of the Moose Lodge's license are readily demonstrated by the record. Moreover, the issues surrounding the denial of the Moose Lodge's license renewal are clearly capable of repetition because it is virtually certain that the Commissioner will continue to incorrectly interpret and misapply the use of proceeds rule in the same manner it did against the Moose Lodge. Thus, in reviewing this case on appeal, and in light of our holding in *W.Va. Educ. Ass'n v. Consol. Pub. Retir. Bd.,* we are primarily concerned with two issues which we believe must be resolved due to substantial public impact with regard to the Commissioner's future enforcement of the applicable West Virginia laws. First, we believe that the Commissioner interpreted the use of proceeds rule as provided by W.Va.Code § 47–21–15 much too narrowly due to its failure to consider the statute in its entirety. Secondly, we believe that the $81,018.00 penalty, as provided by the 1999

Alternative Disposition Agreement, was coerced by the Commissioner and should not have been the basis for the denial of the Moose Lodge's 2002 license renewal.

In the case at hand, the initial problems arose following the July 23, 1999, "Notice of Intent to Suspend Charitable Bingo and Raffle Licenses Notice of Hearing" which was sent to the Moose Lodge. The Notice of Hearing explained that the Commissioner was going to suspend the Moose Lodge's charitable bingo and raffle licenses for a period of six months, effective September 1, 1999. Soon after the Notice of Hearing was mailed to the Moose Lodge, the Commissioner's Criminal Investigation Division (CID) began conducting a series of mandatory meetings around the state with different charitable raffles licensee groups. During an August 8, 1999, meeting, held in Martinsburg, West Virginia and attended by the Moose Lodge, the CID officials, which included the Commissioner's attorneys, told representatives of the Moose Lodge, as well as other fraternal groups, that they were subject to loss of licensure, monetary penalties, and even criminal sanctions if they used *any* of their net charitable raffle proceeds for any of their operational expenses, including mortgage payments. The information presented by the CID during its numerous meetings was a more restrictive policy regarding the use of those proceeds than was previously expressed or enforced by the Commissioner in prior years.

Soon thereafter, on August 11, 1999, based on advice provided by the CID's attorneys at the August 8, 1999, meeting, the Moose Lodge waived its right to have a hearing to challenge the alleged violations in the Commissioner's July 23, 1999, Notice of Hearing. It is clear to any impartial observer that the threats of criminal sanctions, monetary penalties, and loss of license weighed heavily on and unduly influenced the decision-making process of the Moose Lodge when it executed the Agreement to waive its right to the hearing. It was not until September 9, 1999, after consulting with an attorney, that the Moose Lodge learned that the CID's interpretation of the use of proceeds rule under

the West Virginia's charitable raffle laws was a matter open to a different interpretation.

■ The Moose Lodge argues that the Commissioner's interpretation of the rules governing the use of proceeds rule is erroneous due to its inconsistent application of certain key terms of art in the governing statute. According to the Moose Lodge, one example of such inconsistent application was how the Commissioner applied the use of proceeds rule to military veterans organizations versus how they applied the same rules to fraternal organizations such as the Moose Lodge. Under current West Virginia laws, for any group to be licensed to conduct charitable raffles, the entity has to qualify as a "charitable or public service organization" as provided by W.Va.Code § 47–21–5 (1984).[1] The Moose Lodge contends that in spite of having satisfied the licensing requirement, the Commissioner incorrectly determined that a group such as the Moose Lodge would not be entitled to use the net proceeds from its conduct of charitable raffles for any of its organizational expenses because W.Va.Code § 47–21–15(c) requires that such proceeds only be used for "charitable and public service" purposes.

We find the Commissioner's interpretation of the use of proceeds rule, which was subsequently upheld by the circuit court, to be unreasonably restrictive in light of the clear language of the statute when read in its entirety. Moreover, its strong reliance on W.Va.Code § 47–21–15(c), seems to ignore subsections (a) and (b) of that same section of the statute. West Virginia Code § 47–21–15(c) provides:

(c) The cost of any refreshments, souvenirs or any other item sold or otherwise provided through any concession to the patrons may not be paid for out of the gross proceeds from the raffle occasion. The licensee shall expend all net raffle proceeds and any interest earned on the net raffle proceeds for the charitable or public service purposes stated in the application within one year after the expiration of the license under which the raffle occasions were conducted. A licensee which does not qualify as a qualified recipient organization may apply to the commissioner at the time it applies for a raffle license or as provided in subsection (e) [sic (f) ] of this section for permission to apply any or all of its net proceeds to directly support a charitable or public service activity or endeavor which it sponsors.

In spite of section (c), it is clear to us that the Commissioner failed to read that provision in conjunction with those of W.Va.Code § 47–21–15(a) and (b) which provide:

(a) The reasonable, necessary and actual expenses incurred in connection with the conduct of raffle occasions, not to exceed twenty-five percent of the gross proceeds collected during a license period, may be paid out of the gross proceeds of the conduct of raffle, including, but not limited to:

(1) Rent paid for the use of the premises: Provided, That a copy of the rental agreement was filed with the raffle license application with any modifications to the rental agreement to be filed within ten days of being made: Provided, however, That in no event may the rent paid for the use of any premises exceed the fair market value of rent for the premises;

(2) The cost of custodial services;

(3) The cost to the licensee organization for equipment and supplies used to conduct the raffle occasion;

1. West Virginia Code § 47–21–5 provides:
    A charitable or public service organization or any of its auxiliaries or other organizations otherwise affiliated with it, may apply for an annual license. Only one license per year in the aggregate may be granted to a charitable or public service organization and all of its auxiliaries or other associations or organizations otherwise affiliated with it: Provided, That for purposes of this section, the various branches, chapters or lodges of any national association or organization or local churches of a nationally organized church are not con-

sidered affiliates or auxiliaries of each other. The commissioner shall by regulation provide for the manner for determining to which organization, whether the parent organization, an affiliate or an auxiliary, the one license allowed under this section is granted. An annual license is valid for one year from the date of issuance. No organizations may hold a joint raffle occasion under any annual licenses.
    A licensee shall display its annual raffle license conspicuously at the location where the raffle occasion is held.

(4) The cost to the licensee organization for advertising the raffle occasion;

(5) The cost of hiring security personnel, licensed pursuant to the provisions of article eighteen, chapter thirty of this code; and

(6) The cost of providing child care services to the raffle patrons: Provided, That any proceeds received from the provision of child care services shall be handled the same as raffle proceeds.

(b) The actual cost to the licensee for prizes, not to exceed the amounts as specified in section eleven of this article, may be paid out of the gross proceeds of the conduct of raffle.

As sections (a) and (b) clearly provide, there are numerous expenses which the Moose Lodge had the right to pay out of the proceeds collected during its raffle sessions. The narrow interpretation of the statute by the Commissioner, which seems to have ignored the aforesaid sections of the Code, resulted in the preclusion of paying for any such expenses by the Moose Lodge or by any other similarly situated organization. Moreover, perhaps due to the fact that it did not challenge the Commissioner's interpretation of W.Va.Code § 47–21–15, since it waived its right to the July 23, 1999, Notice of Hearing, the Moose Lodge entered into an Alternative Disposition Agreement with the Commissioner whereby it agreed to the donation of $81,018.00 and an admission that it violated the use of proceeds rule. As explained earlier, under the agreement the Moose Lodge was told to make the $81,018.00 charitable donations out of its "general funds ... not be drawn or derived from the charitable raffle accounts" by October 15, 2000, in order to have its suspension withdrawn.

The Moose Lodge subsequently attempted, but was unsuccessful in getting the West Virginia Legislature to clarify the disputed use of proceeds rules under the charitable raffles laws as interpreted by the Commissioner. During the summer of 2001, the Moose Lodge's counsel sought from the Commissioner a clear and detailed explanation of the legal basis for its interpretation of the use of proceeds rule, particularly as it related to veterans and fraternal organiza-

tions. On July 10, 2001, the Commissioner responded in writing to those inquiries. Soon afterward, and due to the hardship which would have occurred with regard to the $81,018.00 sought by the Commissioner, the Moose Lodge attempted to avoid suspension of its charitable raffles license by trying to negotiate a mutually agreed installment payment amount of the total donations called for under the 1999 agreement. When the negotiations failed, the Commissioner notified the Moose Lodge that its charitable raffles license was suspended for a period of six months, beginning October 30, 2001.

After fully reviewing the Commissioner's reasoning as to why it found that the Moose Lodge improperly used the proceeds of its raffle in 1999, a raffle which it clearly had a valid license to conduct, we believe the Commissioner, in addition to his failure to fully consider the provisions of W.Va.Code § 47–21–15 in its entirety, may have also ignored other relevant charitable raffle laws of this State in determining the charitable status of the Moose Lodge. It is clear to us that the Commissioner has chosen to primarily rely on federal income tax treatment of a particular entity in interpreting West Virginia's charitable raffle law. While it may be proper to consider such laws, we believe the Commissioner should have also considered W.Va. Code § 47–21–2(a)(1)–(8) which provides that for purposes of this article, unless specified otherwise:

(a) "Charitable or public service activity or endeavor" means any bona fide activity or endeavor which directly benefits a number of people by:

(1) Contributing to educational or religious purposes; or

(2) Relieving them from disease, distress, suffering, constraint or the effects of poverty; or

(3) Increasing their comprehension of and devotion to the principles upon which this nation was founded and to the principles of good citizenship; or

(4) Making them aware of or educating them about issues of public concern so long as the activity or endeavor is not aimed at

supporting or participating in the campaign of any candidate for public office; or

(5) By lessening the burdens borne by government or voluntarily supporting, augmenting or supplementing services which government would normally render to the people; or

(6) Providing or supporting nonprofit community activities for youth, senior citizens or the disabled; or

(7) Providing or supporting nonprofit cultural or artistic activities; or

(8) Providing or supporting any political party executive committee.

There was no analysis by either the Commissioner or the circuit court as to whether the Moose Lodge exclusively participated in any of those types of activities which would have meant that it would be classified as a "qualified recipient organization" and therefore received more leniency in how it uses the proceeds of its raffles. West Virginia Code § 47–21–2(m) provides:

"Qualified recipient organization" means any bona fide, not for profit, tax-exempt, as defined in subdivision (p) of this section, incorporated or unincorporated association or organization which is organized and functions exclusively to directly benefit a number of people as provided in subparagraphs (1) through (7), subdivision (a) of this section. "Qualified recipient organization" includes, without limitation, any licensee which is organized and functions exclusively as provided in this subdivision.

We make no determination today with regard to whether the Moose Lodge should be classified as a qualified recipient organization because such a determination is not relevant to the resolution of the issues before us in the case at hand. Yet, we do want to point out that the record before us is replete with examples of such activities by the Moose Lodge, and while the positive contributions they have made are too numerous to list in their entirety, it is clear to us that it has engaged in substantial activities which easily qualify under sections one through eight of the aforementioned section of the West Virginia Code. For example, the Moose Lodge has repeatedly made countless donations to the United Way, the Berkeley County Senior Services, the Berkeley County Alzheimer's Association, the Youth Awareness programs, the Martinsburg High School Band Boosters (for uniforms), Big Brothers/Big Sisters, Girl Scouts and Boys Scouts, the Relay for Life, People to People, Hospice of the Panhandle, U.S. Foodservice, American Cancer Society, Avon Breast Cancer, and to the Martinsburg Firefighters. To restrict the Moose Lodge's donations to these and the countless other community-related programs would be devastating to the entire region.

Moreover, there is no dispute that the Moose Lodge is a charitable or public service organization as provided by W.Va.Code § 47–21–2(b), which explains that a:

"Charitable or public service organization" means a bona fide, not for profit, tax-exempt, benevolent, educational, philanthropic, humane, patriotic, civic, religious, fraternal or eleemosynary incorporated or unincorporated association or organization; or a volunteer fire department, rescue unit or other similar volunteer community service organization or association; but does not include any nonprofit association or organization, whether incorporated or not, which is organized primarily for the purposes of influencing legislation or supporting or promoting the campaign of any single candidate for public office.

Perhaps the Commissioner could have assisted the Moose Lodge in guiding it through the balkanized maze enveloping West Virginia's charitable raffle laws. Doing so would have ensured that the Moose Lodge was able to maximize its ability to contribute to its surrounding community through its numerous positive efforts and significant donations which benefit the greater community of the Eastern Panhandle of the State.

■ We believe that the evidence in this case demonstrates that the Commissioner's interpretation of W.Va.Code § 47–21–15 was applied much too strictly against the Moose Lodge and should have been read in its entirety so that *all* of the sections of the statute were given proper weight and consideration. Consequently, based on our law it was unreasonable for the Commissioner not to allow some part of the raffle proceeds to

be used to pay reasonable expenses surrounding the Moose Lodge's charitable raffles as provided by W.Va.Code § 47–21–15(a) and (b). Likewise, given the result of the decision by this Court, we further find that the Moose Lodge's decision to enter into the 1999 Agreement, which included the acquiescence to pay $81,018.00 to charitable organizations from its general revenues, was coerced by the Commissioner due to draconian threats against the Moose Lodge, which at the time was not represented by counsel. Given the possible sanctions, including the threat that it was subject to loss of licensure, substantial monetary penalties, and even threats of criminal sanctions, it is easy to understand why the Moose Lodge entered into the Agreement. Fear of criminal prosecution and incarceration and fear that even more stringent sanctions could have been levied against the Lodge by the Commissioner which would have consequently resulted in even more substantial hardship to the Moose Lodge are great motivators but are unduly harsh and coercive. Resulting potential financial hardships would necessarily have limited the Moose Lodge's ability to continue to support the many worthwhile organizations it contributes to on a yearly basis.

In summary, we believe that the circuit court's finding of fact that the Moose Lodge presented no evidence of coercion with regard to the $81,018.00 penalty was clearly wrong. We further find that the circuit court erred in affirming the Commissioner's unreasonable and incomplete interpretation of the use of raffle proceeds rules as set forth in W.Va.Code § 47–21–15.

## IV.

## CONCLUSION

Accordingly, for the reasons set forth above, the final order of the Circuit Court of Berkeley County entered on December 8, 2004, is reversed.

Reversed.

1. As the majority opinion says, this Moose Lodge has "repeatedly made countless donations" to the United Way, the Berkeley County Senior Services, the Berkeley County Altzeimer's Association, the Youth Awareness Programs, etc. The

STARCHER, J., dissenting:

(Filed July 11, 2006)

I dissent because I believe that the majority's opinion ignored the facts developed in the court below. By ignoring the facts, the majority's opinion made the Tax Commissioner look like the "bad guy" beating up on a bunch of sweet, innocent, good Samaritans.

Nothing could be further from the truth.

I concede—even the Tax Commissioner concedes—that the Loyal Order of Moose contributes lots of money to local and national charities that it raises through its gambling operations.[1] But this case wasn't really about whether this local Moose Lodge could, or could not, donate money to charitable organizations. There was therefore no need for the majority opinion to chide the Tax Commissioner into "assist[ing] the Moose Lodge in guiding it through the balkanized maze enveloping West Virginia's charitable raffle laws."

This case was about a local Moose Lodge that routinely conducted gambling operations without having a license to do so, in plain violation of state law. This Moose Lodge had its charitable raffle license suspended on October 26, 2001. This order was never, ever appealed. The Lodge continued its gambling operations. When it then broke the law, by conducting raffle-type games when the license was suspended, the Tax Commissioner decided to not renew the Moose Lodge's license.

Now, five-and-a-half years later the majority's opinion has taken it upon itself to reverse that order. This alone is troubling, because appellate courts are not constitutionally supposed to reverse orders that haven't been appealed.

Furthermore, how the Tax Commissioner applied the rules regarding the use of the proceeds of charitable raffles had nothing to do with the denial of the Moose Lodge's license renewal application. The majority's

Loyal Order of the Moose also supports Moosehaven, a retirement facility in Florida for senior members of the Moose, and Mooseheart, a city and school in Illinois for children and teens in need.

opinion is, therefore, entirely advisory because the thrust of the Moose Lodge's lawsuit centered upon the denial of the application.

But most troubling is the complete absence from the majority's opinion of the facts explaining *why* the Tax Commissioner felt compelled to issue the October 26, 2001 order suspending the charitable raffle license.

In 1999, the Tax Commissioner sanctioned the Moose Lodge for prior problems with its gambling operations, and a notice of intent to suspend the Moose Lodge's gambling operations was issued in July 1999. The Moose Lodge, by its board of directors, voluntarily elected to waive its right to any hearing on the notice—that is, they tacitly admitted that the facts supporting the suspension of the charitable raffle license were true. However, to avoid having the license suspended, the Moose Lodge—with the advice of a lawyer—entered into an "alternative disposition agreement" with the Tax Commissioner on October 14, 1999.

In the alternative disposition agreement, the Moose Lodge agreed to do two things: contribute $81,018.00 to charitable or public service purposes; and comply with charitable gaming laws for the next three years. The Moose Lodge never challenged this agreement, never filed any collateral proceeding, and never asked for a hearing or petitioned the circuit court for relief. But that didn't matter. The Moose Lodge never complied with either provision of the agreement.

First, no one disputes that the Moose Lodge failed to make the $81,018.00 contribution. Instead, the majority opinion decides that this contribution amount "was coerced by the Commissioner," and therefore that the Moose Lodge's promise to make this contribution could be ignored. This is surprising. It is quite rare to see the members of the majority say that if a law breaker signs an agreement with a prosecutor, and agrees to some penalty—say, a fine or jail time—then this Court will set aside that plea agreement if it was "coerced by the prosecutor." But then, Moose Lodge members vote; most other law-breakers don't.

Second, while most citizens must follow the law as a matter of daily living, the Moose Lodge in the alternative disposition agreement actually went one step further and said to the Tax Commissioner, "we agree to follow the law!" And then, the Moose Lodge broke the law. The Moose Lodge blatantly violated the State's charitable gaming laws.

On September 18, 2001, investigators for the Tax Commissioner inspected the Moose Lodge and inventoried the charitable games that were on the premises. Investigators found numerous raffle-type games for which the Moose Lodge could not produce invoices or other supporting documents, as was required by law. Moose Lodge employees told the investigators they had never seen the games, or that the games must have been given to the Moose Lodge by the raffle distributor as a gift. The employees then suggested that maybe some other organization had used the Moose Lodge premises and accidentally left the games behind—however, a review of the other organizations' records showed none had conducted any raffle events at the Moose Lodge.

The Moose Lodge's license was suspended for six months effective October 30, 2001. As previously mentioned, the suspension order was never appealed. But the Moose Lodge kept right on gambling.

On December 23, 2001, investigators entered the Moose Lodge premises and immediately saw people selling raffle games. When people saw the investigators, they began dumping raffle tickets into trash cans, grabbing the trash bags out of the cans and hustling them out the back door of the building. The investigators confiscated tubs, trash cans and trash bags filled with raffle tickets. When a Moose Lodge employee was asked why they were selling raffle tickets when their license was suspended, the employee told the investigator "the Moose Lodge was going broke and needed the money." Once gain, the Moose Lodge had no invoices or receipts for the raffle-type games—as required by law.

Moose Lodge employees said they weren't sure how the games came to be on the premises, but one told investigators that the games had been "donated" by someone who

was not a licensed distributor or wholesaler of games. Instead, he was "just an old boy that buys raffle items." This gentleman later produced an invoice for the Moose Lodge—but the Tax Commissioner rightly ignored the invoice, since state law said the Moose Lodge was legally required to obtain raffle boards or games only from a licensed wholesaler or distributor. *See W.Va.Code,* 47–23–9.

In sum, the majority's opinion started with a result designed to be "politically appealing" to the Moose Lodge, and then fumbled around to make up some reasoning to support that result. And to get that result required a fastidious avoidance of the facts. The facts developed below clearly show that this particular Moose Lodge routinely broke the law, and was repeatedly given "another chance" by the Tax Commissioner to clean up its act. The majority opinion deliberately ignored the evidence, and thereby manufactured a politically appealing decision.

I therefore respectfully dissent.