IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2019 Term

_____

No. 18-0429

_____

FILED

November 21, 2019

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

DIVISION OF JUSTICE AND COMMUNITY SERVICES, and
LAW ENFORCEMENT PROFESSIONAL STANDARDS SUBCOMMITTEE
Petitioners

v.

FAIRMONT STATE UNIVERSITY,
Respondent

_____

Appeal from the Circuit Court of Marion County
The Honorable Patrick N. Wilson, Judge
Civil Action No. CC-24-2017-AA-1

AFFIRMED

_____

Submitted: September 11, 2019
Filed: November 21, 2019

Patrick Morrisey
Attorney General
Kelli D. Talbot
Senior Deputy Attorney General
Charleston, West Virginia
Counsel for the Petitioners

John F. Dascoli, Esq.
Charleston, West Virginia
Counsel for *Amicus Curiae*
West Virginia State Lodge of the
Fraternal Order of Police, and West
Virginia Deputy Sheriffs' Association

Rebecca Pomeroy, Esq.
Bailey & Glasser LLP
Charleston, West Virginia
Counsel for the Respondent

JUSTICE HUTCHISON delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.      "On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W.Va. Code § 29A-5-4(a) and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong." Syllabus Point 1, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996).

2.      "In cases where the circuit court has [reversed] the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*." Syllabus Point 2, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996).

3.      "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syllabus Point 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975).

4.      "Statutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments." Syllabus Point 3, *Smith v. State Workmen's Comp. Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975).

5. "Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation." Syllabus Point 2, *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970).

6. "As a general rule of statutory construction, the word 'may' inherently connotes discretion and should be read as conferring both permission and power. The Legislature's use of the word 'may' usually renders the referenced act discretionary, rather than mandatory, in nature." Syllabus Point 1, *Pioneer Pipe, Inc. v. Swain*, 237 W.Va. 722, 791 S.E.2d 168 (2016).

7. "Administrative agencies and their executive officers are creatures of statute and delegates of the Legislature. Their power is dependent upon statutes, so that they must find within the statute warrant for the exercise of any authority which they claim. They have no general or common-law powers but only such as have been conferred upon them by law expressly or by implication." Syllabus Point 3, *Mountaineer Disposal Serv., Inc. v. Dyer*, 156 W.Va. 766, 197 S.E.2d 111 (1973).

8. The Law-Enforcement Training and Certification Act, West Virginia Code §§ 30-29-1 to -13, does not authorize the Law-Enforcement Professional Standards Subcommittee of the Governor's Committee on Crime, Delinquency and Correction to deny an application to establish and operate a law-enforcement training academy that otherwise meets the standards established under West Virginia Code § 30-29-3(a) (2015).

**HUTCHISON, Justice**:

In this appeal from the Circuit Court of Marion County we are asked to examine the Law-Enforcement Training and Certification Act ("the Act"), contained in West Virginia Code §§ 30-29-1 to -13. Pursuant to the Act, a state university decided to create a new law-enforcement-training academy for senior university students majoring in criminal justice studies. The university filed an application with the state agency that oversees law-enforcement training, seeking authorization to establish and operate the academy. The proposed academy met or exceeded the requirements of both the Act and the regulations adopted under the Act. However, the state agency refused the application, claiming that there was "no need" for a new academy.

The circuit court reversed the state agency's decision, finding it was arbitrary, capricious, and unsupported by law, and ordered that the agency approve the university's application. As set forth below, we find no error and affirm the circuit court.[1]

## I. Factual and Procedural Background

The petitioner in this case is a government agency the parties call "LEPS" or the "LEPS subcommittee," their abbreviation for the Law-Enforcement Professional Standards Subcommittee of the Governor's Committee on Crime, Delinquency and

---

[1] We thank the West Virginia State Lodge of the Fraternal Order of Police and the West Virginia Deputy Sheriffs' Association for their *amici curiae* brief.

1

Correction.  *See* W.Va. Code §§ 30-29-1(5) and (9) (2018).[2]  The LEPS subcommittee exists, in part, to "[r]eview and administer programs for qualification, training and certification of law-enforcement officers in the state[.]"  W.Va. Code § 30-29-2(a)(1) (2015).  Under West Virginia law, "a person may not be employed as a law-enforcement officer by any West Virginia law-enforcement agency . . . unless the person is certified" by LEPS "as having met the minimum entry level law-enforcement qualification and training program requirements[.]"  W.Va. Code § 30-29-5(a) (2015).

LEPS also approves and authorizes the academies that conduct training for law-enforcement officers.[3]  By statute, LEPS is required to promulgate rules that "[e]stablish standards governing the establishment and operation of the *law-enforcement training academies, including regional locations throughout the state*[.]"  W.Va. Code § 30-29-3(a)(2) (2015) (emphasis added).  LEPS is also required to create rules setting the qualifications for instructors at the training academies.  W.Va. Code § 30-29-3(a)(3).  By statute, the rules promulgated by LEPS must include "standards governing the training, firearms qualification and initial . . . professional certification" of new law-enforcement

---

[2] *See also* W.Va. Code §§ 15-9-1 to -6 (establishing and creating duties for the Governor's Committee on Crime, Delinquency and Correction).

[3] *See* W.Va. Code § 30-29-1(1) (2018) ("'Approved law-enforcement training academy' means any training facility which is approved and authorized to conduct law-enforcement training[.]"); 149 C.S.R. § 2.2.1 (2018) ("'Approved law enforcement training academy' means any training facility that is approved and authorized by the Law Enforcement Professional Standards Subcommittee, to conduct law enforcement training.").

officers, as well as "the entry-level law-enforcement training curricula." W.Va. Code § 30-29-3(a)(6). For instance, by rule, LEPS currently requires entry-level law-enforcement officers to receive a minimum of 850 hours of training. 149 C.S.R. § 2.7.1 (2018).[4]

LEPS currently authorizes the operation of only one entry-level law-enforcement-officer-training academy: the West Virginia State Police Academy.

On February 25, 2016, respondent Fairmont State University filed an application with LEPS seeking authorization to establish and operate a new law-enforcement-officer-training academy. Fairmont State wanted to offer an entry-level training program for students who were in their senior year and pursuing a Bachelor of Science criminal justice degree.

The parties agree that Fairmont State's 2016 application proposed a training program that met or exceeded the guidelines established by LEPS. Specifically, Fairmont State students majoring in criminal justice would be required to complete a total of 1,210 hours of law-enforcement coursework. Fairmont State emphasized that students would have to make a four-year university commitment to the field of criminal studies. Only after completing the foundational coursework would Fairmont State permit students, during one semester of their senior year, to complete an additional 805 hours of academy-specific

---

[4] We note that in February 2016, the regulations then in effect required entry-level law-enforcement officers to receive a minimum of 800 hours of training. 149 C.S.R. § 2.7.1 (2015).

classroom courses and 405 hours of foundational law-enforcement coursework. The university's proposed training program specified that no student would be permitted to enroll for just one semester to take the police-academy-only courses.

On June 10, 2016, LEPS denied Fairmont State's application to create a new law-enforcement-training academy. In a letter to Fairmont State, the LEPS subcommittee declared it had reached a consensus that the university's proposed academy was simply not necessary. The members of LEPS expressed their belief that the State Police Academy "fully meets the needs of the demand for the training and certification of entry level officers within the state[.]"[5]

---

[5] The members of LEPS also expressed concerns that Fairmont State might, in the future, seek monies from the Law Enforcement Training ("LET") fund, a chronically-underfunded LEPS-administered fund to support entry-level training. West Virginia Code § 30-29-4 (2019) creates the LET fund, a special revenue account funded by a fee added to court costs imposed, and bonds posted, in all criminal cases. Between 2015 and 2019, the fee was $2.00; in 2019, the fee was increased to $12.00. From that account, LEPS must disburse funds "for the funding of law-enforcement entry level training programs, professional development programs, the certification of law-enforcement officers, and to pay expenses of the Governor's Committee on Crime, Delinquency, and Correction, or the subcommittee in administering the provisions of this article." *Id.*

LEPS argues, in one paragraph of its brief, that it can deny Fairmont State's application because of the possibility the university might seek money from the underfunded LET account. We decline to address this argument because Fairmont State has not sought money from the LET fund. Further, it is unlikely Fairmont State will ever seek money from the fund: Fairmont State proposes having classes with no more than twenty students, while LEP's regulations require classes of twenty-five or more students to receive funding. 149 C.S.R. § 2.3.4.1 ("Minimum registration for any entry level training class funded by the Subcommittee is twenty-five (25) officers."). *See State ex rel. Universal Underwriters Ins. Co. v. Wilson*, 239 W.Va. 338, 345, 801 S.E.2d 216, 223

Fairmont State appealed the denial of its application to the director of the Division of Justice and Community Services (the agency that, effectively, oversaw the LEPS subcommittee and the Governor's Committee).[6] The director subsequently issued a recommended decision to the Governor's Committee on Crime, Delinquency and Correction, and recommended affirming the LEPS subcommittee's rejection of the application. The Governor's Committee adopted the recommendation.

Fairmont State then appealed to the circuit court. In a detailed order entered April 12, 2018, the circuit court reversed the decision by LEPS. The circuit court first found that the Legislature did not confer upon LEPS the authority to deny an application that meets the established criteria for an entry-level training program. Furthermore, the circuit court found that LEPS did not have implicit discretionary authority to deny an application based on its opinion that there was "no need" for a new law-enforcement-

---

(2017) ("Questions that may never arise or are purely advisory or hypothetical do not establish a justiciable controversy."); *State Farm Mut. Auto. Ins. Co. v. Schatken*, 230 W.Va. 201, 210, 737 S.E.2d 229, 238 (2012) ("Courts are not constituted for the purpose of making advisory decrees or resolving academic disputes[.]" (Citations and quotations omitted)).

[6] When this case began in 2016, the Division of Justice and Community Services was the agency that provided staff assistance to LEPS. However, in 2018 and 2019, the Legislature folded the Division of Justice and Community Services, its employees and its duties into a new organization: the Division of Administrative Services, a division of the Department of Military Affairs and Public Safety. *See generally*, W.Va. Code §§ 15A-2-1 to -5. The Division of Administrative Services is now "the designated staffing agency for, and shall provide executive and administrative support to, the Governor's Committee on Crime, Delinquency, and Correction, and all of its subcommittees" – including LEPS. W.Va. Code § 15A-2-1(b) (2019). It does not appear that this government reorganization affects this appeal.

training academy. As the circuit court found, "[a] review of the relevant code section and rules reveals . . . that LEPS may not deny an application on the basis that there is not a need for more than one training program."

Before the circuit court, LEPS raised a novel reason for denying Fairmont State's application. Essentially, LEPS contended that it could not authorize Fairmont State's proposed academy because the university's students were not employed by a law-enforcement agency before attending Fairmont State, and would not receive a salary or reimbursement while attending the Fairmont State academy. Citing to West Virginia Code § 30-29-5(b), which provides that a law-enforcement agency *may* conditionally hire an untrained, uncertified person before the person attends an academy, LEPS argued that the Legislature "implicitly contemplated" that a person attending a training academy *shall* first have been conditionally employed by a law-enforcement organization. Additionally, LEPS claimed that if students were not employed *before* attending Fairmont State's academy, there was no assurance they would be employed *after* graduating. LEPS pointed to regulations providing that if a certified law-enforcement officer is not employed by a law-enforcement agency for two years or more, that officer must undergo substantial retraining to regain the certification.[7] LEPS argued it could refuse to authorize Fairmont State's

---

[7] *See* 149 C.S.R. § 2.15.3 ("Law enforcement officers . . . who have been separated from a law enforcement agency for more than twenty-four (24) months, but less than sixty (60) months[,] . . . are required to either test for credit . . . or, attend and successfully complete within twelve (12) months of the date of employment" various specified law-enforcement courses).

academy because the students who failed to be hired by a law-enforcement agency within two years of graduation might have to repeat much of their academy training to be re-certified.

The circuit court rejected LEPS's arguments, finding them neither "reasonable nor in conformance with a reasonable extension of the duties conferred" upon LEPS by law. The Legislature enacted statutes that empowered LEPS to implement rules for the establishment of entry-level law-enforcement-training academies. The circuit court found nothing in those statutes to "imply an application can be denied if it meets the criteria for establishing an entry-level training program." Conversely, the circuit court found that the statutes and rules "recognize that an academic institution could be approved to operate a law enforcement training program" and "recognize circumstances where officers may be certified through means outside the West Virginia State Police Program." The circuit court determined that the Legislature intended to allow academic institutions like Fairmont State to offer a law-enforcement-training academy, and found that LEPS's position that universities should not be permitted to offer such training was neither reasonable nor implied in any statute.

The circuit court concluded that the decision by LEPS to deny Fairmont State's application was arbitrary and capricious. The circuit court therefore reversed the decision, and remanded the case with instructions that LEPS take those steps necessary to approve Fairmont State's application for an entry-level law-enforcement training program.

7

LEPS (along with the Division of Justice and Community Services) now appeals the circuit court's order.

## II. Standard of Review

At its heart, this is an appeal under the West Virginia Administrative Procedure Act, which establishes the following standards for a court reviewing an administrative decision:

> (g) The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision or order are:
>
> (1) In violation of constitutional or statutory provisions; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedures; or
>
> (4) Affected by other error of law; or
>
> (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or
>
> (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

W.Va. Code § 29A-5-4(g) (1998).

In this appeal, the parties agree on the facts. Their dispute centers on the legal standards that guide LEPS. Accordingly, we review the circuit court's decision de novo. As we said in Syllabus Point 1 of *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d

8

518 (1996), "[o]n appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W.Va. Code § 29A-5-4[g] and reviews questions of law presented *de novo*[.]" Further, we said in Syllabus Point 2 of *Muscatell* that, "[i]n cases where the circuit court has [reversed] the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*." 196 W. Va. at 590, 474 S.E.2d at 520.

### III. Discussion

Petitioner LEPS asserts that the circuit court's order was in error, for two reasons. First, LEPS contends that the circuit court failed to give deference to LEPS's interpretation and application of the laws and regulations regarding law-enforcement training academies. Second, LEPS argues that it had the implicit right, within its discretion, to refuse Fairmont State's application on the ground that there was no "actual need" for the university's proposed academy. As we discuss below, we reject both of these arguments.

We begin with the claim that the circuit court failed to give deference to LEPS's interpretation and application of the law. LEPS's argument is wide-ranging, but it essentially contends that its decision as an administrative agency is entitled to great weight. The fundamental point that LEPS advances is that West Virginia Code § 30-29-5(b) provides that if a person has not been certified by LEPS as a law-enforcement officer, a law-enforcement agency *may* still conditionally hire that person. LEPS contends this statute impels the conclusion that LEPS may reject Fairmont State's proposed academy.

9

LEPS's argument on this point is founded upon one clause contained within West Virginia Code § 30-29-5. Paragraph (a) of that statute requires that LEPS must certify that any person employed as a law-enforcement officer has met the minimum law-enforcement training standards. Four paragraphs of the statute (paragraphs (b), (c), (d), and (e)) detail various methods by which a person may receive a certification from LEPS. For instance, paragraph (d) discusses how a person who has achieved "satisfactory completion of the course of instruction in law enforcement" from a training academy outside of West Virginia can receive certification. LEPS, however, focuses its argument on one clause in paragraph (b), which provides:

> [A] person who is not certified . . . may be conditionally employed as a law-enforcement officer until certified[.]

W.Va. Code § 30-29-5(b). West Virginia Code § 30-29-5(b) goes on to require that the conditionally hired employee attend a training academy. Thereafter, the law-enforcement agency must pay the conditionally hired employee's "wages, salaries, benefits, tuition and expenses, for the employees' attendance at a law-enforcement training academy." W.Va. Code § 30-29-8(a) (2015).[8] The employing law-enforcement agency may require the

---

[8] 149 C.S.R. § 2.6.7 requires the employing law-enforcement agency to pay a trainee officer's salary and certain expenses:

> The trainee's salary for a forty-hour work week while undergoing training and his or her travel costs to and from the training site are the responsibility of the employing agency. Cost of training uniforms, fatigues and other personal equipment required for training shall be paid for by the employing agency.

10

conditionally hired employee to enter into a contract that obligates the employee to repay the agency if the employee voluntarily quits within one year after completing training. W.Va. Code § 30-29-8(b).

LEPS points out that Fairmont State's application proposes to operate a law-enforcement-training academy for university students, one that enrolls students and then charges them tuition. LEPS argues, in its brief, that this proposed system is fatally flawed because it divorces students "from existing employment with a law enforcement agency and . . . graduates students without regard to whether or not a demonstrable need exists for their employment in the real world." On this ground, LEPS claims it is implicitly empowered to deny Fairmont State's application.

We find no merit to the argument offered by LEPS. We find no ambiguity in the statutes cited by LEPS, and find no implied power by LEPS to deny an application to establish and operate a training academy, when that application meets or exceeds the requirements set by statute and by LEPS's regulations.

We begin our analysis with several fundamental rules of statutory construction. First and foremost, "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Martin v. Randolph Cty. Bd. of Educ.*, 195 W.Va. 297, 312, 465 S.E.2d 399, 414 (1995). Moreover,

11

"[s]tatutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments." Syl. pt. 3, *Smith*, 159 W. Va. at 109, 219 S.E.2d at 362. Accordingly, we look not just to a lone clause in one paragraph in one statute; we consider the entire statutory scheme as crafted by the Legislature.

LEPS contends that the interpretation of a statute by the government agency charged with its administration is entitled to great weight by the courts. LEPS is partially correct in this contention. As we said in Syllabus Point 4 of *Security National Bank & Trust Co. v. First W.Va. Bancorp., Inc.*, 166 W.Va. 775, 277 S.E.2d 613 (1981), "[i]nterpretations of statutes by bodies charged with their administration are given great weight unless clearly erroneous." When a government agency issues interpretations of a statute, the interpretations are "entitled to some deference from the courts" but are "entitled on judicial review only to the weight that their inherent persuasiveness commands." *Appalachian Power Co. v. State Tax Dep't of W.Va.*, 195 W.Va. 573, 583, 466 S.E.2d 424, 434 (1995).

LEPS's contention assumes, however, that the statute interpreted by the agency is ambiguous. Contrary to LEPS's position, a court is "obligated to defer to an agency's view only when there is a statutory gap or ambiguity." *W.Va. Health Care Cost Review Auth. v. Boone Mem'l Hosp.*, 196 W.Va. 326, 337, 472 S.E.2d 411, 422 (1996). If the intent of the statute is clear, a court need not defer to an agency's interpretation of a statute it administers. As we have said, "[w]here the language of a statute is free from

12

ambiguity, its plain meaning is to be accepted and applied without resort to interpretation." Syl. pt. 2, *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970). "We look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co.*, 195 W.Va. at 587, 466 S.E.2d at 438. In other words, "[t]he rule[s] of construction . . . [apply] only when the Legislature has blown an uncertain trumpet. If ambiguity or silence does not loom, the occasion for preferential interpretation never arises." *W.Va. Health Care Cost Review Auth.*, 196 W.Va. at 337, 472 S.E.2d at 422.

An objective reading of West Virginia Code § 30-29-5(b) shows that the Legislature intended to give law-enforcement agencies flexibility in hiring decisions. The statute provides that a person "*may* be conditionally employed[.]" (Emphasis added). There is nothing mandatory about the Legislature's choice of the word "may" in the statute. "As a general rule of statutory construction, the word 'may' inherently connotes discretion and should be read as conferring both permission and power. The Legislature's use of the word 'may' usually renders the referenced act discretionary, rather than mandatory, in nature." Syl. pt. 1, *Pioneer Pipe, Inc. v. Swain*, 237 W.Va. 722, 791 S.E.2d 168 (2016). If it chooses, a law-enforcement agency *may* conditionally hire an individual who lacks law-enforcement training and certification. Only then is the individual required to attend a law-enforcement-training academy, and the agency required to pay the trainee-employee's salary, tuition, and expenses.

13

Nothing in West Virginia Code § 30-29-5 addresses LEPS's authority over law-enforcement training academies. More importantly, nothing in that section confers upon LEPS the authority to deny an application to create an academy that meets the criteria required of an entry-level law-enforcement training program.[9]

We have examined the Law-Enforcement Training and Certification Act, West Virginia Code §§ 30-29-1 to -13, as a whole and find a cohesive and clear statement by the Legislature regarding law-enforcement officer training. The Legislature clearly intended to permit, and to encourage, the operation of multiple training facilities in West Virginia. In West Virginia Code § 30-29-3(a)(2), the Legislature empowered LEPS to create standards "governing the establishment and operation of the law-enforcement training *academies*, including regional locations throughout the state[.]" The Legislature did not use the singular "academy" but used the plural "academies," and thereby

---

[9] We note that *after* Fairmont State filed its application in February 2016, and *after* LEPS rejected the application in June 2016, LEPS modified its regulations to seemingly create a right in LEPS to refuse an application based solely upon need. Effective May 1, 2017, LEPS promulgated 149 C.S.R. § 3.3, entitled "Need," which provides that LEPS "is responsible for determining the need as to the number and type of entry level certification training academies/programs and their location." 149 C.S.R. § 3.3 is contained in the current regulations which took effect on July 1, 2018. LEPS did not cite to this regulation in its brief or arguments, but we do not find the regulation controlling as we otherwise find no statutory foundation for 149 C.S.R. § 3.3 (2018) in the West Virginia Code.

14

encouraged the establishment and operation of multiple academies located in different regions throughout the state.[10]

LEPS contends, however, that it has never permitted a non-law-enforcement entity, like a university, to train law-enforcement officers. This argument is belied, however, by a reading of the law. The relevant statutes make clear that a person seeking law-enforcement certification from LEPS can, in part, rely on classroom time spent at a university. West Virginia Code § 30-29-3(a)(6) requires LEPS to give a prospective officer credit "for relevant classroom hours earned pursuant to training *other than training at an established law-enforcement training academy* . . . and shall provide that the required classroom hours can be accumulated on the basis of a part-time curricula . . . or a full-time curricula[.]" (Emphasis added.)

Additionally, the Legislature clearly contemplated that LEPS could certify law-enforcement officers who received training from facilities other than the West Virginia State Police Academy. West Virginia Code § 30-29-5(e) provides that if a person has "satisfactorily completed a course of instruction in law enforcement equivalent to or

---

[10] LEPS concedes that, in years gone by, it permitted the operation of numerous regional academies operated by local law-enforcement agencies (including the Beckley, Charleston, and Huntington Police Departments). LEPS argued these regional academies operated at a time when there was a lengthy waiting list for entry to the West Virginia State Police Academy, and there was an urgent need to get law-enforcement officers trained and certified. LEPS contends that no such waiting list exists now at the State Police Academy, and hence, there is no need for Fairmont State's proposed academy.

exceeding the minimum applicable law-enforcement training curricula promulgated by" LEPS, then that person is exempt from attending a West Virginia law-enforcement-training academy.[11] Because there is only one current West Virginia training academy, we presume this means training received at out-of-state academies. We cannot conceive how LEPS can read this statute as allowing a prospective law-enforcement officer to be certified after attending an out-of-state academy, but as prohibiting the creation of more than one in-state academy.

Finally, the regulations promulgated by LEPS (and approved by the Legislature) anticipate that an academic institution like Fairmont State may operate a training academy. For instance, one regulation requires every training academy to appoint a "Director of Training," and provides guidelines for how the director is to be appointed at an academy that is "under an *academic institution*[.]" 149 C.S.R. § 2.4.1.a (2018) (emphasis added). The regulations also recognize the likelihood of "an academy other than the West Virginia State Police Academy." 149 C.S.R. § 2.4.1.b. The regulations go on to impose various requirements for individuals to be certified as law-enforcement instructors, but individuals who are "college and university faculty members" can automatically achieve Level 1 instructor status by applying to LEPS. 149 C.S.R. § 2.5.4.a and 4.b (2018).

---

[11] Regulations promulgated by LEPS allow applicants to be certified as law-enforcement officers if they "[h]ave completed a Peace Officer's Standards and Training Commission (POST) approved basic entry-level training program or equivalent federal law enforcement training, excluding military police." 149 C.S.R. § 2.14.1.a (2018).

16

Having examined the entirety of West Virginia Code §§ 30-29-1 to -13, we can infer no legislative authority for LEPS's position. LEPS's essential argument is that because West Virginia Code § 30-29-5(b) says that a law-enforcement agency "may" conditionally hire a person before the person has attended an academy, all individuals who seek to attend an academy must be employed by a law-enforcement agency. It therefore argues that Fairmont State cannot operate an academy, because university students are not employed by a law-enforcement agency before they take academy classes. The circuit court found this argument wholly unsupported by the law, and found nothing in those statutes "that imply an application can be denied if it meets the criteria for establishing an entry-level training program." We find no error in that conclusion.

However, LEPS offers a second argument. LEPS argues that it has the implied discretion to consider whether or not there is an actual need for a proposed program to meet the needs of existing law-enforcement agencies in this State. Again, LEPS concedes that Fairmont State's proposed program meets all of the qualifications that LEPS requires to establish and operate a law-enforcement training program. The overarching argument by LEPS is that it has the implicit authority to reject any application it chooses to reject.

This Court has found that the power of administrative agencies is dependent upon their governing statutes. As we found in Syllabus Point 3 of *Mountaineer Disposal Service, Inc. v. Dyer*, 156 W.Va. 766, 197 S.E.2d 111 (1973):

17

Administrative agencies and their executive officers are creatures of statute and delegates of the Legislature. Their power is dependent upon statutes, so that they must find within the statute warrant for the exercise of any authority which they claim. They have no general or common-law powers but only such as have been conferred upon them by law expressly or by implication.

In other words, "[a]n administrative agency is but a creature of statute, and has no greater authority than [that] conferred under the governing statutes." *State ex rel. Hoover v. Berger,* 199 W.Va. 12, 16, 483 S.E.2d 12, 16 (1996) (citations omitted).

LEPS asserts that it has an implicit responsibility to ensure that new law-enforcement officers are needed, and asserts that the only way to achieve this goal is for law-enforcement agencies to first hire candidates before they attend an academy. LEPS argues, in its brief, that untethering students from this system, allowing them to enroll in a university-based academy, and then be "put out into the law enforcement job market without a job attached" is "within the ambit of [LEPS's] reasonable concern."

LEPS, however, cites to no authority in the West Virginia Code to support its position. It cites to no explicit authority, and likewise can point to no ambiguous language indicating the Legislature intended to imply such authority. Even the Governor's Committee on Crime, Delinquency and Correction rejected LEPS's position, stating that "[t]here is no 'trigger' for the establishment of the academies, such as a backlog at the existing academy or some other need." The West Virginia Code and the regulations promulgated by LEPS clearly contemplate the authority for multiple law-enforcement training academies, and clearly intend that academic institutions may establish and operate

18

training academies.  We conclude that the circuit court correctly rejected this position by LEPS.

In summary, we hold that the Law-Enforcement Training and Certification Act, West Virginia Code §§ 30-29-1 to -13, does not authorize the Law-Enforcement Professional Standards Subcommittee of the Governor's Committee on Crime, Delinquency and Correction to deny an application to establish and operate a law-enforcement training academy that otherwise meets the standards established under West Virginia Code § 30-29-3(a) (2015).

## IV. Conclusion

LEPS's decision to deny Fairmont State's application to establish and operate an entry-level law-enforcement-training academy was arbitrary, capricious, and not supported by any statutory authority.  We therefore affirm the circuit court's order reversing LEPS's decision and remanding the case with instructions that LEPS take those steps necessary to approve Fairmont State's application.

Affirmed.

19